THE STATE v. FRANK L. SUMMERS, Appellant.—6 S. W. (2d) 883.

Division Two, May 25, 1928.

*Matthews & Jones, Dan R. Hughes, John D. Dale, H. J. Libby* and *W. L. Hamrick* for appellant.

*North T. Gentry,* Attorney-General, and *David P. Janes,* Assistant Attorney-General, for respondent.

HIGBEE, C.—Frank L. Summers, cashier of the Bank of Ethel, an incorporated banking institution located at the town of Ethel in Macon County, Missouri, was indicted on October 9, 1924, and charged in the first count with having received on deposit in said bank on April 9, 1923, $358.05, the money and property of W. L. Baker, after he, the said Summers, well knew that said bank was in failing circumstances and insolvent. The indictment is based on Section 3365, Revised Statutes 1919, and contains six other counts, each charging the receipt of a deposit of money on the same day. The counts are identical except as to the names of the depositors and the amounts of the several deposits.

The defendant was arrested in Kansas City, Missouri, on April 10, 1925. A change of venue was awarded to Shelby County, where the case was tried on February 15, 1926. The State dismissed as to the fourth count of the indictment. At the close of the evidence for the State the court sustained a demurrer to the third count, and overruled a demurrer to counts 1, 2, 5, 6 and 7, the ground of demurrer being that neither count stated facts sufficient to constitute a violation of the section of the statute.

The trial continued from day to day until February 19, when the jury returned a verdict finding the defendant guilty as charged in the first count of the indictment and assessing his punishment at two years in the penitentiary. The jury made no finding as to the remaining four counts of the indictment and, on motion of the defendant, the court discharged him as to those counts. The court sentenced the defendant according to the verdict and he appealed.

I. Appellant assigns error in that the court failed of its own motion to require the State to elect upon which one of the seven counts in the indictment it would place the defendant upon trial, and in not limiting the evidence offered by the State to one count. No objection was made by the defendant to the joinder of the seven counts. There was no motion to quash for misjoinder, nor to require the State to elect. The first objection to the misjoinder was made in appellant's assignment of errors in this court.

"The general rule is that duplicity in an information or an indictment is cured by verdict (State v. Nieuhaus, 217 Mo. 332, 117 S. W. 73; State v. Davis, 237 Mo. 237, 140 S. W. 902); but that it is error to refuse to sustain a demurrer or a motion to quash a duplicitous indictment or information when the attack is timely made and the error properly preserved for review." [State v. Flynn, 258 Mo. 211, 219, 167 S. W. 516.]

In State v. Brown (Mo.), 296 S. W. 125, the defendant was charged in separate counts with five distinct felonies. On page 127, Judge WHITE said:

"At the beginning of the trial a motion to elect would have been proper and should have been sustained. The defendant, however, at that time did not move to elect, but did object to the introduction of any evidence on that ground, and it was error in the court to overrule that objection. That error is not saved in the motion for new trial."

By going to trial without objection the error of misjoinder was waived. [Kelley's Crim. Law, sec. 200; 31 C. J. 883.]

II. For many years Summers had been cashier and chief executive officer of the Bank of Ethel. Following the year 1920, due largely to the financial depression then existing, that bank found itself possessed of a considerable amount of uncollectible paper. During the latter part of 1922, Summers expressed the desire to be relieved of his duties as cashier and caused the minutes of the board of directors to show his resignation as such. The directors, however, disavowed any knowledge of such entry in the minute record. Some effort was made by the president of the bank to secure a suitable man to take his place. Notwithstanding all this, Summers continued to act as cashier until April 5th or 6th, 1923, when he went to Chicago with a shipment of hogs. From Chicago he wrote to J. R. Heaton, president of the bank, as follows:

"I hand you herewith my resignation as cashier of the bank of Ethel, Ethel, Missouri, which is already in effect. I have written Jose to come down at once and take my place. There seems to be something wrong with me, and I must have a change and rest. Will see you later.                "Yours truly, F. L. SUMMERS."

Following the departure of the defendant, the assistant cashier, Ben Jones, and a former cashier, Jose Bradley, referred to in defendant's letter, conducted the affairs of the bank for a few days, when a conference was held by the board of directors and, at the suggestion of Mr. Roscoe Gooding, a stockholder and banker in a neighboring town, the directors temporarily closed the bank and notified the Finance Department, requesting an examination of the condition of the bank. In due time bank examiners arrived and remained in charge of the bank until about the 15th day of May, at which time the bank reopened and, so far as the record in this cause shows, has been a going concern ever since without loss to any creditor.

The bank had been examined on March 23, 1923. During the examination the examiner called the attention of the defendant and the board of directors to the large amount of undesirable paper in the note case and other things subject to criticism. Immediately after the examiner left, Summers remarked to the assistant cashier

that it was not any trouble to fool a bank examiner. Two or three weeks after the examination the defendant instructed the assistant cashier not to allow C. N. Townsend, one of the directors, to look at the books of the bank.

The Bank of Ethel was capitalized at $15,000. At the time in question its books show. a surplus account of $7500 and an undivided profit account of $1335.49. There was evidence that notes owned by the bank aggregating from $25,000 to $30,000, were uncollectible at and prior to the time of the deposit, and had not been collected at the time of the trial on February 15, 1926. The record is somewhat vague as to the plan adopted by the directors for reopening the bank, and as to what disposition was made of these bad notes, and as to how they were taken out of the assets of the bank. From the testimony we infer they were charged off and a bond given by the directors equal to the amount of the paper charged off, upon the execution of which the bank reopened.

It is apparent from the testimony that the defendant ran the bank and conducted its affairs with but little interference, aid or assistance from the directors. They were kept largely in the dark as to its condition. At the monthly meetings of the board of directors the notes themselves were not presented to the directors, but, instead, the cashier produced the note register from which he would describe to the directors the notes the bank owned and the security back of them.

Much of the evidence in this case has to do with the various notes above referred to, owned by the bank, and their value on and prior to April 9, 1923, the day laid in the indictment as being the one on which the defendant received the deposits complained of in the seven counts of the indictment. They had not been collected at the time of the trial and were charged off and their book value made good by the directors in some manner not very well explained by the record, at the time the bank reopened for business on May 15, 1923. These notes alone made the bank insolvent at the time of the deposit, as they exceeded in amount the full capital, surplus and undivided profit accounts. There was evidence of substantial liabilities not shown on the bank's records, so we think the defendant's contention that there is no evidence of the insolvency of the bank at the time of the deposit is not well taken.

III. Nor do we think that the fact that no depositor suffered any loss is a controlling fact in the case. Fortunately for them, loss was averted by the action of the directors in refinancing the bank and in replacing the bad paper. But that of itself is no defense to this action.

IV. By the first count of the indictment, the defendant stands charged with the reception of a deposit of $358.05 on April 9, 1923. The proof shows this deposit was made on March 2, 1923. The defendant objected to the introduction of proof of such deposit on said date as not being the offense charged in the indictment. Section 3908, Revised Statutes 1919, cures the error complained of in the date of the deposit: "No indictment or information shall be deemed invalid . . . for omitting to state the time at which the offense was committed, in any case where time is not of the essence of the offense, nor for stating the time imperfectly."

V. Many objections were offered by the defendant to the introduction of evidence by the State, but as they were not particularly called to the attention of the trial court by the motion for new trial, as required by Laws 1925, page 198, they are not here for review. [See State v. Standifer, 289 S. W. 856.]

VI. Appellant complains of the following instruction for the State:

"10. The court instructs the jury that if you find that the Bank of Ethel, of Ethel, Missouri, failed on April 2, 1923, then such fact, if it is a fact, is prima-facie evidence of knowledge on the part of the defendant that the said banking institution was insolvent and in failing circumstances on March 2nd, March 3rd, March 6th, March 7th and April 7th, 1923. The court instructs the jury that prima-facie evidence is such that raises such a degree of probability in its favor that it must prevail unless it be rebutted."

It is claimed that this instruction is authorized by the concluding clause or proviso to Section 3365, Revised Statutes 1919. There is, however, no evidence in the record that the Bank of Ethel failed. On the contrary, the evidence shows that it did not fail. A few days after the defendant's flight, the directors of the bank temporarily closed it for examination by the State Bank Commissioner. As heretofore stated, losses on account of bad loans were made good, the bank was reopened and, so far as the record discloses, continued business as a going concern without loss to any creditor of the bank.

The term "failure" as used in the statute is a technical term. A bank may be in an insolvent or failing condition without a failure resulting. "Failure is commonly applied to such discontinuance of business as results from insolvency or bankruptcy; suspension is usually temporary, and may or may not involve insolvency." [Webster's New Inter. Dict.]

Failure, when used in connection with any enterprise, in its ordinary and obvious sense, means abandonment or defeat. [25 C. J. 430.] In note 60 it is said, quoting from White v. Pettyjohn, 23 N. C. 52, 55: "There may be checks . . . but so long as the enterprise is prosecuted and its results are unascertained, there is no failure." The giving of this instruction was prejudicial error.

VII. The complaints of errors in the giving and refusal of other instructions are general and not specific as required by the Laws of 1925, page 198, and will not be considered. There are other errors assigned in the motion for new trial that are not referred to in appellant's brief or assignment of errors and are considered as abandoned.

The judgment is reversed and the cause remanded. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by HIGBEE, C., is adopted as the opinion of the court. All of the judges concur.