THE STATE v. ALVIA HILL, Appellant.—44 S. W. (2d) 103.

Division Two, December 1, 1931.

224

*James E. Sater, W. B. Skinner, Ruark & Ruark* and *Robert Stemmons* for appellant.

226

*Stratton Shartel*, Attorney-General, and *Ray Weightman*, Assistant Attorney-General, for respondent.

WHITE, P. J.—An information filed in the Circuit Court of Lawrence County charged that Edward C. Hill, president and director, Alvia Hill, cashier, and Emory Hill, vice-president and director, of the Stotts City Bank of Stotts City, in Lawrence County, while said bank was insolvent and in failing condition received and held in deposit one check for $34.50, of the value of $34.50, drawn by Kelly & Underwood Construction Company, upon the State Bank of Granby, Missouri, payable to A. Schoen; that said officers and directors received and assented to the reception of said money with knowledge that the Stotts City Bank was insolvent and in failing condition.

On a separate trial December 1, 1930, Alvia Hill was found guilty by a jury and his punishment assessed at two years in the penitentiary. The appeal is from the judgment following.

The following stipulation was read into the record:

"It is admitted that the Stotts City Bank was a banking institution incorporated under the laws of the State of Missouri, and doing business at Stotts City, Missouri, as such banking institution, on and prior to the 27th day of November, 1928; that the defendant Alvia Hill was, on and prior to the said 27th day of November, 1928, cashier of said bank; that on the 27th day of November, 1928, the said Stotts City Bank, through its officers and agents, received into said bank as and for a deposit in said bank a check for the sum of

thirty-four dollars and fifty cents, drawn by Kelly & Underwood Construction Company, a corporation, by A. G. Kelley, on the State Bank of Granby, Missouri, said check being numbered two six five seven eight, dated November 23, 1928, payable to A. Schoen, otherwise known as Arthur Schoen, and that said check was of the value of thirty-four dollars and fifty cents at the time it was so received. It is admitted that said deposit was made in said bank in Lawrence County, Missouri.''

The next day after the check was received, November 28, 1928, by resolution of the board of directors, the bank closed its doors and placed its assets in the hands of the Commissioner of Finance for liquidation.

The books of the bank showed the following resources and liabilities:

### Resources

| | |
|---|---|
| Bills receivable | $122,672.81 |
| Central National Bank, Carthage, Mo. | 100.31 |
| Cash & Cash Items | 1,431.26 |
| Expense Account | 2,684.00 |
| War Savings Stamps | 4.40 |
| Other Real Estate owned | 4,411.87 |
| Overdrafts | 70.62 |
| Banking House | 2,000.00 |
| Mt. Vernon Bank, Mt. Vernon, Mo. | 9,966.40 |
| Farmers State Bank, Mt. Vernon, Mo. | 2,500.00 |
| Total | $145,841.67 |

### Liabilities

| | |
|---|---|
| Capital Stock | $ 10,000.00 |
| Interest & Discount | 9,727.84 |
| Individual Deposits | 51,984.29 |
| Time Deposits | 19,557.43 |
| Surplus Funds | 20,000.00 |
| Cashier Checks | 15,072.11 |
| Bills Payable | 19,500.00 |
| Total | $145,841.67 |

The principal inquiry was directed to the bills receivable, which comprised the bulk of the assets, more than $122,000. The record contains a list of the notes, several hundred in number, many of them secured by deeds of trust on real estate and chattel mortgages on personal property. The notes and the mortgages and deeds of trust are set out in the record. A large volume of evidence was introduced in regard to the values of many of those notes, the makers themselves being sworn on behalf of the State. The bank examiners

found some of the items in the resources not quite accurate, and less than shown in the statement. It was testified further by the State that only about $22,000 had been collected by the Commissioner of Finance.

I. Appellant first complains of the refusal of the trial court to give Instruction S, asked by defendant, as follows:

"The court instructs the jury that in considering the condition of the bank of Stotts City on the 28th day of November, 1928, you will not take into account the $10,000 of capital stock of said bank or the $20,000 surplus of said bank, as liabilities."

It will be noted that among the liabilities listed in the Bank's statement is Capital Stock $10,000, and Surplus Funds $20,000. Of course those items were not liabilities as to the creditors, and should not be counted in determining the solvency of the bank, that is, its ability to meet its obligations in the usual course of business. With those items deducted the total liabilities were about $115,000.

There was an instruction telling the jury not to consider the capital stock as a liability, but it left the $20,000 surplus which it was possible for them to consider as liability. The State seems to concede it was error to refuse Instruction S; but argues that the "State's evidence tended to show a deficit of more than $70,000.00," therefore there was a deficit of $50,000, anyway, and it would have made no difference in the result. An instruction should not be limited in application to what the State's evidence "tends to show." It should be based upon the entire evidence. We have no right to conclude that the jury necessarily believed all the evidence introduced by the State and disbelieved contradictory evidence introduced by the defendant. The State introduced evidence tending to show that the notes were worth only about thirty or forty thousand dollars. The defendant introduced evidence tending to show that the notes were worth about fifty cents on the dollar, or would have been worth that in the natural course of business if the bank had continued in operation. That would make more than $60,000 worth of notes. Other assets amounted to about $23,000, in real estate, money in other banks, and the like. Further, among depositors was the defendant E. C. Hill, credited with a deposit of more than $27,000. Under the circumstances shown by the State it might have been established that his deposit could not be listed among the general assets on account of his conduct in connection with the bank. Taking all of those items into consideration the value of the assets and the actual liabilities are not so far apart as to preclude a finding

on the evidence that the bank might reasonably have continued in business. It was closed by the voluntary action of the board of directors. The appellant, cashier, was not a board member. If the bank had refused to receive the deposit when offered the day before, that would have been equivalent to a closing of the bank at that time. It was possible for the jury to believe that the cashier might first have come to a realization that the bank could not continue in business when the directors actually closed its doors. It was not only necessary to prove that it was in a failing condition, but that this appellant knew it was in a failing condition and could not continue in business on the day before the directors reached that conclusion and suspended operations. Considering all the circumstances it was error to refuse that instruction.

II. Appellant complains of the failure of the court to give his instructions Q and R, which told the jury that they should find for the defendant unless the bank was in failing condition and the defendant knew it, at the time the deposit was received. These instructions are offered as the converse of Instruction 1, which hypothesized all the facts necessary for the jury to find in order to find the defendant guilty.

Instruction 1, after requiring a finding of those facts, concludes with these words: "and unless you so find you should acquit the defendant." The converse of a positive instruction for the State should usually be given when asked by a defendant charged with a crime. But Instruction 1 covers the ground covered by the converse instructions Q and R, which the court refused. We are not prepared to say that the failure to give those instructions on that account was error which would reverse the judgment though they or instructions of like import could properly have been given.

III. It is complained that Instruction 4, given for the State, is erroneous in defining "insolvency of the bank." The complaint is that the definition would require the bank to meet all its obligations at once whether due or not. The instruction is not open to that objection for it required the jury to find that the bank is in failing circumstances "when from any cause it is unable to pay its debts in the ordinary and usual course of business."

The court refused defendant's Instruction D, of which complaint is made, but Instruction 4 covered the same ground.

Appellant also objects to Instruction 3, given for the State, because it authorized a verdict without finding that the offense was committed in Lawrence County, Missouri. Appellant is not in

position to make that objection because in the agreed statement of facts set out above it is said that the Stotts City Bank was doing business in Stotts City, and that the deposit was made in said bank in Lawrence County, Missouri.

IV. Appellant complains of Instruction 6, which told the jury that upon the question of whether the Stotts City Bank was in a failing condition November 27th, and if in a failing condition whether defendant had actual knowledge thereof, "you will take into consideration all the facts and circumstances detailed in evidence as to the conditions of said bank on said day."

The complaint is that the jury in determining whether the defendant knew of the condition of the bank, would take into consideration all that was discovered after it was closed. But Instruction 5, just preceding Instruction 6, told the jury that the knowledge of the defendant "must be measured by what he actually knew, if anything, concerning the bank's solvency or insolvency when said deposit was accepted, and he is not chargeable with knowledge of the bank's financial condition as shown by later events and subsequent investigation."

This is so definite and positive that taken with other instructions which place before them the issues, it is not possible that the jury could understand that the defendant could be convicted unless he knew on the day the deposit was received that the bank was in failing condition. The statute provides that the fact that it was insolvent at that time is prima-facie evidence that he knew it. It was entirely proper for the jury to take into consideration all the facts and circumstances relating to its condition at the time, although revealed by subsequent investigation, and determine whether under those facts as they existed he knew. His actual knowledge may be proven not only by evidence bringing notice directly to him, but by circumstances which in his position he had opportunity to know. The jury might take all those things into consideration. While the instruction might have been a little more explicit as to why the jury should consider all the evidence, we cannot say that taken with Instruction 5, Instruction 6 was error.

V. The appellant complains of error in the trial court's permitting witness Shelton to say that certain notes purporting to be excluded by him were forgeries, without showing that the defendant knew they were forged, and refusal by the court of an instruction by defendant withdrawing such evidence from the jury. Defendant made no proper objection to the evidence at the time it was offered. Besides, it

was entirely proper to show that such notes were forgeries on the issue as to the actual solvency of the bank. Defendant offered no instruction that such evidence should be considered for that purpose only.

VI. Appellant further complains of a number of errors in the admission of evidence which was properly competent as showing the condition of the bank at the time, although the specific facts testified to were not proven to have been known to the defendant. He also presents objections to some evidence which we cannot find in the record.

Appellant further complains that the court erred in permitting counsel for the State to insinuate that the makers of certain notes had subsequently gone into bankruptcy. So far as we can ascertain from the record, objections to such remarks were sustained by the court.

VII. One alleged error upon which appellant expends considerable argument was permitting witnesses T. H. Powell, Jeff Steele and C. F. Krueger to give their opinions and conclusions of the value of the assets of the bank. Those three witnesses were a depositor's committee to examine the assets in order to determine the value of the notes; they are the ones who testified that the notes were worth from $30,000 to $40,000. Mr. Powell, when he was on the stand, testified as follows:

"Q. How long have you lived in Stotts City? A. Ten years.

"Q. In what business are you engaged? A. Drug business.

"Q. Are you acquainted with the people generally in that community and the value of their property that they own? A. Fairly good.

"Q. Were you on any committee after the failure of the Stotts City Bank—immediately after—that had to do with going over the assets and making an estimate of the assets as of the date November 27, 1928? A. Yes sir. . . .

"Q. Now Mr. Powell, from your knowledge of that neighborhood and the value of lands and the value of assets held by these note makers, were you able to state what was the reasonable value of the $122,000 worth of notes held by the Stotts City Bank on November 27, 1928?"

This was objected to as calling for a conclusion and for the further reason that witness had not shown himself conversant with the property of the individual. Objection was overruled.

"Q. Do you know what would have been their value? A. I think I do, yes sir. . . .

"Q. Tell the jury what would have been the fair value of the assets in that bank if it had remained a going concern and those had remained in the bank. A. Somewhere between thirty and forty thousand dollars."

When Mr. Steele was on the stand he was asked this question:

"Q. Were you familiar with the neighborhood and with the amount of property that was owned by the note makers, or most of them, in the Stotts City Bank? A. Yes sir.

"Q. You may tell the jury whether or not you went over all those notes and applied to them your knowledge of the assets owned by the different note makers for the purpose of forming an opinion as to the value of those notes held by the Stotts City Bank as of the date of November 27, 1928? Did you do that? . . .

"Q. You may answer whether or not you did that? Yes or no. . . . A. Yes, sir.

"Q. Were you able, from the knowledge you had of the makers of the notes and the property owned by them, real and personal, to form an opinion as to the value of those assets represented by notes on loans, if the bank had remained a going institution, as of the date November 27, 1928? Answer that yes or no. . . .

"A. Yes, sir."

He then gave his estimate of the value of the notes. On cross-examination he said that he knew that the assets of the bank as a going concern were worth more than the assets when it was closed.

When Mr. Krueger was on the stand he was asked:

"Q. Are you acquainted with the people down in that community? A. Yes sir.

"Q. Is it your business and have you learned and do you know the financial worth of the different people? A. Yes, I think I do."

He then stated that he was a member of the committee, and testified as follows:

"Q. Mr. Krueger, have you ever examined the notes that were found in the assets of the bank, or that were there at the time it closed on November 28, 1928, and have you applied to them your knowledge of the people in that community, particularly the note makers, of the value of their assets, real and personal, and known by you, for the purpose of forming an opinion as to the value of those assets, if they had remained in the bank and it had remained a going institution as of November 27, 1928? A. Yes sir.

"Q. Have you an opinion now as to the value of those assets based on that investigation? A. Yes sir. The committee met and went over the matter and we formed an opinion. .

"Q. Tell the jury, what, in your opinion, those notes were worth that were in the bank."

Witness answered that about $35,000 worth of the notes were good.

It is complained that neither of these witnesses was shown to be qualified to give his opinion of the value of the notes.

In the Sanford case, 317 Mo. l. c. 874, such evidence was held to be incompetent because the witness did not show that he had any expert knowledge of the value of milling machinery, of stocks and furniture, although he had sufficiently shown that he had knowledge of real estate.

In the case of State v. Peer, 39 S. W. (2d) l. c. 530, a witness was asked about assets in a manner very similar to the examination here. He said he knew the note makers in the bank about which he was being examined, "in a general way." That he had made no attempt to collect those notes. We held that he was not qualified, that his statement "in a general way" that he knew the people was insufficient; he did not say directly that he knew any particular individual or his financial worth.

Mr. Powell was asked if he was acquainted with the people in the community, and the value of their property. He answered "fairly good." That was the only way in which he qualified. Then he was asked if from his knowledge of that neighborhood and the value of the land and the value of the assets held by those note makers, whether he was able to state the reasonable value of the notes. That last question implied that he had knowledge of the note makers, and of the assets held as security for their notes. But he had not said that he knew them or knew those assets. The prompt objection should have warned the State to have the witness state what his specific knowledge of the assets of the note makers was.

Steele was asked if he was familiar with the neighborhood and the amount of property that was owned by the note makers, "or most of them." He answered that he was. Then he was asked to tell the jury whether he went over all the notes and applied to them his knowledge of the assets owned by the different note makers for the purpose of forming his opinion as to the value of the notes. He answered that he did. He was then asked if from his knowledge of the makers of the notes and property owned by them he was able to form an opinion as to the value of the assets represented by the notes, he answered, "Yes."

The extent of his knowledge was a matter of cross-examination and he was not cross-examined on it. His knowledge was implied in the questions and answers. The appellant is hardly in position to complain that he was not qualified. [State v. McClure, 31 S. W. (2d) l. c. 48; State v. Lewis, 20 S. W. (2d) l. c. 532-3.]

Krueger was asked questions similar to those asked Steele and he answered in much the same way.

On another trial those witnesses should be asked more particularly about their knowledge of the note makers and their assets.

The judgment is reversed and the cause remanded. All concur except *Henwood, J.*, not sitting.