The State v. L. E. Thompson, Appellant.—64 S. W. (2d) 277.

Court en Banc, October 19, 1933.

1070

*Mills & Jayne, H. S. Rouse* and *Brown & Gibbons* for appellant.

*Stratton Shartel*, Attorney-General, and *Albert Miller*, Assistant Attorney-General, for respondent.

ELLISON, P. J.—The defendant was charged by information in the Circuit Court of Adair County with receiving for deposit in the Bank of Willmathsville, a state banking institution of which he was cashier, a check for $460.28 on August 24, 1928, when he knew the bank was insolvent and in failing circumstances, in violation of Section 4116, Revised Statutes 1929. The case was sent on change of venue to Lewis County in the same circuit, and there, a further application being filed under Section 3648, Revised Statutes 1929, disqualifying the circuit judge, the Hon. E. C. Hilbert was chosen by agreement as special judge. The trial resulted in a conviction of the defendant. His punishment was assessed by the jury at imprisonment in the penitentiary for two years, and he appeals from the judgment and sentence on that verdict.

The defendant stood on his demurrer to the State's evidence. The bank and nearly all the bank records were destroyed by fire on August 29, 1928, five days after the reception of the deposit, and was closed by order of its board of directors the next day, August 30. Most of the assignments of error on this appeal complain of the insufficiency of the evidence and of the admission of evidence offered by the State in these exigent circumstances to show the financial condition of the bank at the time—its assets and liabilities. The information, also, is challenged and some of the instructions are assailed.

The evidence tending to show the financial condition of the bank was, in general, along this line. As soon as the ruins of the bank had cooled sufficiently J. B. Norris, state bank examiner for that district, searched them and took such papers and records as were recovered to the Commercial State Bank at Kirksville, then in process of liquidation in the hands of L. L. Vaughn, special deputy finance commissioner. The principal thing of value found in the vault was the note case with its contents. There were also some old books and records, some customers' papers charred by the fire, and in the money safe, which appeared to have been left partly open, pennies to the amount of $2.82. Also, Mr. Norris found some checks and deposit slips which appeared not to have been entered on the bank books. There was, however, no deposit ledger.

The defendant reported to his board of directors and to the authorities that he was held up and forcibly taken from the bank by robbers at the time of the fire. Mr. Norris made an inventory of all assets and liabilities of the bank, as far as he could determine them at the time and filed a triplicate copy thereof with the State Finance Department and another with Mr. Vaughn, deputy commissioner. This inventory was introduced in evidence, marked plaintiff's Exhibit 17. It was as follows:

### · ASSETS

| | |
|---|---:|
| Loans | $58,039.86 |
| Overdrafts | ? |
| Banking house | ? |
| Furniture and fixtures | ? |
| Other real estate | ? |
| Cash | 2.82 |
| Due from Farmers State Bank, Greentop, Mo. | 2,771.01 |
| Due from Bank of Kirksville, Kirksville, Mo. | 1,029.97 |
| Cash items | 126.16 |
| Checks on banks apparently not entered on books | 1,968.05 |
| | $63,937.87 |

## LIABILITIES

| | |
|---|---:|
| Capital | $15,000.00 |
| Surplus | ? |
| Undivided profits | ? |
| Individual deposits | ? |
| Time deposits | ? |
| Bills payable | 34,000.00 |
| Deposit slips apparently not entered on books | 4,790.24 |
| State Savings Loan & T. Co. (Quincy, Ill.) over-draft | 230.85 |
| To balance | 9,916.78 |
| | $63,937.87 |

Mr. Vaughn, the special deputy commissioner, continued the investigation started by Mr. Norris, the bank examiner. In stating the facts developed by him and shown in evidence at the trial, we shall take up the assets and then the liabilities, dealing with the items of each in the order in which they appear in the foregoing inventory.

First as to the loans. Notes to the closed bank for the aggregate amount of $7966.61 were found in the note case. Notes for $8501.75 were in the bank vault in an envelope addressed to the State Savings, Loan & Trust Company of Quincy, Illinois, and for $2425 in an envelope addressed to the Farmers' State Bank of Greentop, Missouri. This made $18,893.36 of notes in the bank. Notes for $31,627 were held as collateral by said Quincy bank, and notes for $7519.50 by said Greentop bank. All the foregoing taken together made the aggregate of $58,039.86 appearing in the inventory. Dummy notes, being duplicates or copies of original notes, also were found to the amount of $12,818, but these were not included in the inventory Mr. Vaughn said, though earlier in his testimony at one place he had stated they were. We think it apparent they were not so figured because enough original notes were accounted for to make up the total. There was no proof as to the amount of notes on hand August 24, the day the deposit was received.

However, this inventory assumed, as did the State throughout the trial, that the notes found in the note case and the two envelopes plus the notes pledged to the Quincy and Greentop banks, all totaling $58,039.86 as above stated, were the only notes the closed bank owned. Some doubt is cast on this assumption by the fact that during the previous three years the loans apparently had run some $10,000 higher than that. The reports of the annual examinations for 1926 and 1927, made by the Department of Finance, and the official statement of April 12, 1928, verified by the defendant's affidavit—about four and one-half months before the bank burned—

disclose that the personal loans had stood a little above or below $65,000, in addition to which the bank had carried real estate loans of from $2750 to $3500, this latter being the figure when the bank was examined in April before the fire. The notes up for collateral never were in the possession of the deputy commissioner. They were held by the pledgee banks and their identity and amount were ascertained from reports made by these two banks. The proof on this point was largely hearsay, and was objected to, but perhaps there was enough other evidence to establish their existence though the question is close.

The evidence as to the value of the loans on August 24 and 30, the dates on which the deposit was received and the bank was closed, is exceedingly meager and much of it of doubtful probative value. Mr. Vaughn testified the amount uncollected on the notes in his possession at the time of the trial—which began on October 20, 1930, nearly two years after the bank closed—was $7602.99. We presume this refers to the $18,893.36 notes found in the bank, as the notes up for collateral never were in his hands. There was testimony that most of these notes were uncollectible but the evidence fails to show when they became so.

As to the notes up for collateral. The evidence was that the $31,627 in notes held by the State Savings Loan & Trust Company of Quincy, Illinois, had been sent by the trust company to a firm of attorneys in Kirksville, Missouri, for collection. The stenographer for this firm testified that $14,904.25 had been collected on these notes, as evidenced by certain duplicate deposit slips in her possession. There had been one additional collection of $163, but the witness was not certain whether the foregoing was all the money collected on the notes, or whether her employers had deducted attorney fees from the amounts collected before remitting. It is, furthermore, not clear what part of these collections was for interest and what part was paid on the principal—in other words, what part of the principal remained unpaid. The auditor of the Quincy Trust Company said the amount paid to his company, as shown by the credits on the note secured by the collateral, was $14,429.18. We find nothing in the record showing the $7519.50 in notes held as collateral by the Farmers' State Bank of Greentop, were worth less than their face on the day the deposit was received by the defendant.

No overdrafts due the bank were ever found, so far as the record discloses. The overdrafts stood at $757.85 on April 12, 1928, when the last official statement was made.

Reports of previous examinations running as far back as 1926 and the official statement of April 12, 1928, showed the banking house had been carried on the books at $9121.75. It was insured against loss by fire for $6000. Of this $5000 was collected. So far as we have been able to find, no witness testified as to its value in August, 1928.

Mr. Vaughn, the special deputy commissioner said he did not know. There is evidence indicating the cost of the building when it was constructed in 1919 was $7500, and that it had depreciated some in value with use. No evidence was introduced to show the value of the lots on which the building stood.

There was no testimony as to the value of the furniture and fixtures in August, 1928. They had been carried at $2630.33 through the years 1926, 1927 and 1928, as shown by the examination reports for the first two of those three years and the official statement published in April, 1928.

The "other real estate" in the inventory consisted of 440 acres of farm land in Schuyler County and eighty acres in Scotland County, all encumbered for $15,400. The land had been carried on the bank books for four years as of the value of $12,000. This, we take it, would represent the value of the equity, making the value of the fee $27,400. There was expert opinion testimony for the State from three witnesses, whose average valuation per acre for 160 acres of the Schuyler County land in August, 1928, was $31.50, making that tract worth $5040; and for another eighty acres of the Schuyler County land $15.40 per acre, amounting to $1232. We find no testimony as to the value of the remaining 200 acres of the Schuyler County land. The average value per acre put by these witnesses on the Scotland County eighty acres was $15.40, fixing the value of that tract also at $1232, and making 320 acres of the entire 520 acres in both counties worth $7504, with the remaining 200 acres not valued, as against a bank valuation of $27,400. The record shows that in the course of the liquidation one eighty-acre tract was deeded by the Finance Commissioner to reduce the encumbrance on the rest, and that later the remaining land was foreclosed, the bank realizing nothing. The date of this foreclosure, however, was not shown.

As stated, $2.82 in coins were found in the bank safe. There was also a cash slip in the vault calling for coin money, $163.48, and paper money, $4002, a total of $4165.48. The defendant stated to Mr. Norris, the bank examiner that this was the amount of cash on hand at the close of business on August 29, 1928, the day the bank burned. If such was the fact, the money was either taken by the robbers, as the defendant reported, or was destroyed in the fire, or otherwise made way with. There is no evidence showing the amount of cash on August 24, the day the deposit was received. When the bank statement was made the preceding April the cash stood at $557.82.

The fact was verified at the trial that on August 24, 1928, the day the deposit was received, there was due the Bank of Willmathsville from the Farmers' State Bank of Greentop in the form of a deposit account the sum of $2728.01. The record does not show the amount

due on August 30, the day the Willmathsville bank closed. On the two dates just mentioned the Willmathsville Bank had on deposit in the Bank of Kirksville $552.27.

The preliminary inventory made by Mr. Norris, the bank examiner · showed among the assets of the Willmathsville Bank "cash items, $126.16." These were shown to consist of a post office money order for $5.00 and a check on another bank for $121.16.

The last entry on the foregoing inventory was "checks on bank apparently not entered on books,—$1968.05." These checks were found in the bank vault, and the defendant told Mr. Norris they were checks which had been cashed but not posted on the ledger and charged to the accounts on which they were drawn. ·

The bank carried burglary and robbery insurance for $5000 and the defendant cashier was bonded for $10,000. The record does not show whether anything was realized from these sources.

Turning to the "Liabilities" side of the inventory. The capital stock of the bank was $15,000, as shown therein. There was no proof of a surplus, and during the previous five years the bank had had none as appears from the reports and statement covering that period. Neither was there any showing as to undivided profits on August 24 and 30, 1928. The largest amount carried under this item in the reports and statement for the preceding five years was $1370 in 1925; the lowest $240.91, in April, 1928, four months before the bank closed.

As the deposit ledger was destroyed in the fire, or at least not found, the State had great difficulty in proving the amount of deposits carried by the bank. First as to the demand deposits. Claims on regular deposit accounts were filed with the deputy commissioner. The defendant went over these with him and challenged three of them, all of which were rejected. The defendant said the others were approximately correct. These totaled $31,078.14. Also certain miscellaneous claims were filed and allowed: one for $97.68 for bailing hay; two claims on alleged time deposits presented by Leonard and Margaret Loomis and Nancy J. Smock, which were rejected as such and entertained as ordinary deposit claims in the aggregate amount of $2789.78, and the claim of H. A. Coursey for $3190. .This would make the demand deposit claims, including the aforesaid miscellaneous claims, foot up to $37,155.60. There may be some duplications in the foregoing. It is not clear from the record what the H. A. Coursey claim of $3190 was for. He testified his deposit account with. the Willmathsville Bank started in about 1920 at about $2000 and never increased. The State has not analyzed the foregoing evidence in the briefs. We have gone over the record of more than 600 pages as best we can and the above is our conclusion. As bearing on its probable correctness we may add the official reports and statement for the preceding four years show an average amount of demand

deposits of $38,843.96. On April 12, 1928, at the last examination before the bank closed, these deposits stood at $38,146.41.

The time deposits proven totaled $15,588.55. Mr. Norris testified the defendant said they were correct. During the preceding three years they had run about $19,000. Outside of these, one claim filed for $2650.43 on an alleged time deposit was cut to $1360.42 and allowed as a common claim. Another for $1429.36 was entertained as a deposit claim instead of a time certificate. Both these are included in the items listed in the preceding paragraph.

The bills payable consisted of a $5000 note given by the Bank of Willmathsville to the Farmers' Bank of Greentop, secured by the collateral aforesaid; and a $29,000 note to the State Savings Loan & Trust Company of Quincy, Illinois, with which was the $31,627 collateral heretofore mentioned. The existence of these notes was established by the officers of the payee banks, and the defendant admitted they were correct.

The preliminary inventory also showed "deposit slips apparently not entered on books," $4790.24. The evidence showed that in the vault of the burned bank were found deposit slips totaling $972.83, dated from August 24 to August 28. The defendant told Mr. Norris these represented deposits which had not been entered on the books. Other deposit slips were found, amounting to $3817.41, all dated the last day the bank remained open, August 29. These taken together made the figure carried in the inventory, $4790.24.

The last item in the preliminary inventory was an overdraft of $230.85 on the account of the Bank of Willmathsville at the State Savings Loan & Trust Company of Quincy. The auditor of the latter stated at the trial the account showed an overdraft of $556.81 on August 24, 1928; on August 29, the day of the fire, $340.31; and on August 30, the day the board of directors closed the bank, $230.85, the amount shown in the inventory. Other facts will be stated as necessary in the course of the opinion.

I. The defendant filed a motion to quash the information, alleging: that it failed to charge any crime; that it was too vague and indefinite to advise him of the precise nature of the accusation made against him; and that it charged several separate and distinct crimes. He assigns error in the overruling of this motion, and further independently asserts, as a matter of error arising on the face of the record proper, that the information is insufficient to support a conviction.

The information charges in substance that on August 24, 1928, the defendant, then and there being cashier of the Bank of Willmathsville, received for deposit in said bank with knowledge that the same was insolvent and in failing circumstances, "a certain

valuable thing and right of action, to wit a check for the payment of money." Next follows a description of the check for $460.20, drawn on the Knox County Savings Bank and signed by Bessie Grainger. The information then goes on to say that after so receiving the check for deposit the defendant paid to the holder, Wm. Ambrosia, Sr., the sum of $25 from said deposit, leaving the value of the check and right of action aforesaid $435.26, being the property of the said William Ambrosia, Sr., which the defendant in the manner and form aforesaid, did steal, take and carry away.

Two specific objections are made by the appellant. The first is that the information in the beginning alleges a deposit of the *check* for $460.26, and then makes the inconsistent charge that $25 cash was paid to the holder and that the deposit was of the balance of $435.26, in *money*. On this point State v. Sheets (Mo.), 289 S. W. 553, is cited, that decision holding an information charging embezzlement of a draft will not support a conviction for embezzlement of money, though the money be the proceeds of the draft. We think, however, the information here was sufficient. It plainly alleges the check was deposited and that the defendant paid Mr. Ambrosia $25 "from said deposit," not that the check was first cashed, $25 paid to him and the balance in money deposited. It is true the information does allege the value of the "right of action and check" deposited, remaining after the payment of the $25, was $435.26, but that is not an allegation that the money and not the check was deposited. The facts are different from those in judgment in State v. Salmon, 216 Mo. 466, 520, 115 S. W. 1106, 1122. And, under the holding in State v. McClure, 325 Mo. 1228, 1241, 31 S. W. (2d) 39, 43, a banc case, the allegations in the information were sufficient to advise the defendant of the charge made against him.

The second objection, as we understand it, is that the information concludes with the alleged repugnant charge that the defendant did "take, steal and carry away" the right of action and check to the value of $435.26, the balance remaining as aforesaid. It was held in State v. Sattley, 131 Mo. 464, 483, 33 S. W. 41, 46, that the crime defined by the statute is in the nature of larceny, and that an indictment so concluding is not subject to the objection of repugnancy. Indeed, Section 4116, Revised Statutes 1929, expressly says if any of the bank officers specified shall receive a deposit in the circumstances enumerated, "he shall be deemed guilty of larceny." This assignment is therefore ruled against the defendant.

II. It is next assigned there was no proof of the *corpus delicti* independent of the extrajudicial admissions of the defendant. Defendant contends a showing was necessary on the following points —all without resort to evidence of admissions of the defendant—

to-wit: (1) that the Bank of Willmathsville was a going banking institution on August 24, 1928; (2) that the defendant was cashier thereof; (3) that he received the deposit alleged in the information; (4) that the bank was then insolvent or in failing circumstances; (5) that the defendant knew it. It is asserted the State offered no substantial evidence outside of the defendant's proven admissions on two of these five points, namely, to show defendant was cashier of the bank, and that the bank was insolvent or in failing circumstances.

The rule in this State is that full proof of the *corpus delicti* independent of the defendant's extrajudicial admissions is not required. On the contrary, what seemed to be only slight corroborating facts have been held sufficient. [State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523.] Neither is it essential that all the independent proof of the *corpus delicti* came first in order of proof. [7 R. C. L., sec. 6, p. 778; 16 C. J., sec. 1514, p. 737.] The defendant's specific assignments under this head are to be measured by the foregoing rules.

(a) There was evidence that the defendant had served as cashier of the bank for several years before the time in question. The stamped endorsement of the bank on the back of the check deposited says "L. E. Thompson, cashier." Minutes of a meeting of the board of directors at which the defendant was present, and signed by him, held the day after the fire and six days after the deposit was made, describe him as cashier, as does an exhibit introduced by the defendant, himself, speaking from a date a few months earlier. This, in connection with the defendant's admissions, was enough to make an issue. [Skarda v. State, 118 Ark. 176, 175 S. W. 1190.]

(b) Was there sufficient proof that the bank was insolvent or in failing circumstances, independent of the defendant's admissions? According to the testimony the defendant admitted certain checks found in the ruins were checks which had been paid by the bank but not yet charged to the drawers' accounts; and that certain deposit slips represented money deposited with which customers' accounts had not been credited. Also, he admitted the claims filed on depositors' checking accounts and on time certificates were correct, except a few; and that the "Bills Payable, $34,000" was made up of a $29,000 note to the State Savings Loan & Trust Company of Quincy, and a $5,000 note to the Farmers' Bank of Greentop. There was other proof tending to establish all of these facts. The checks and deposit slips were discovered in the ruins in the vault or safe; the claims on checking deposits and time certificates were independently presented by the claimants; and the two notes due other banks were produced and proven by officers of those banks. If each of these items or elements of proof stood alone, we should say there was sufficient corroborating evidence to let in the admissions. But, on the whole, did

the State make out a prima facie case of the bank's insolvency? That question we discuss in the next division of this opinion.

III. Under the statute Section 4116 (which was repealed after the trial below, Laws 1931, p. 201) the ultimate questions were: (1) whether the bank was insolvent or in failing circumstances *when the deposit was received;* (2) and did the defendant know it at the time. [State v. Thompson (Mo.), 29 S. W. (2d) 67, 70; State v. Sanford, 317 Mo. 865, 874, 297 S. W. 73, 76.] But the proviso at the end of the section made the subsequent failure of the bank prima facie evidence of both of these facts. [State v. Shelby, 333 Mo. 1036, 64 S. W. (2d) 269; State v. Burlingame, 146 Mo. 207, 227, 48 S. W. 72, 77; State v. Buck, 120 Mo. 479, 488, 25 S. W. 573, 575.]

The *failure* of a bank within the meaning of the statute meant a discontinuation of business from insolvency, bankruptcy or the like, such as ordinarily would result from prior conditions and have a natural tendency to prove the bank was in failing circumstances when the deposit was received theretofore. [3 Words & Phrases (1 Series), p. 2646; State v. Stewart (Mo.), 29 S. W. (2d) 120, 123; State v. Summers, 320 Mo. 189, 195, 6 S. W. (2d) 883, 885; State v. Lively, 311 Mo. 414, 442, 279 S. W. 76, 84.] From all this it follows there were *two* dates to which evidence as to the insolvency of the bank properly might have been directed; (1) the date the deposit was received; (2) the subsequent date when the bank failed.

Since there is no evidence on so many items that would enter into a daily statement of the condition of the Bank of Willmathsville on August 24, 1928, the day the deposit was received, we shall not attempt a discussion of the proof directly bearing thereon. But we do set out below a summary of the assets and liabilities on August 29 and August 30, the days the bank burned and closed, as shown by the evidence in the record. We omit from the assets "overdrafts" because there was no proof of the amount of these, and we omit also any figure for "other real estate" because there was no evidence as to the value of 200 acres of the 520 acres of farm land the bank owned. We use for the items "banking house" and "furniture and fixtures" the amounts shown in Mr. Norris' preliminary inventory since the State adduced no evidence showing their value was less; and for the same reason we fix the amount due from the Farmers' Bank of Greentop at $2771.01, as appears in the Norris inventory. On the liability side of the statement capital stock, surplus and undivided profits are left out because in an inquiry as to the insolvency of the bank within the meaning of Section 4116 these items are not to be considered as against the defendant. [State v. Hill, 329 Mo. 233, 44 S. W. (2d) 103, 105; State v. Lewis, 323 Mo. 1070, 1089, 20 S. W. (2d) 529, 537; State ex rel. Arndt v. Cox, 327 Mo. 790, 795, 38 S. W. (2d) 1079, 1081.] Also a matter of fact, there was no proof that

the bank had a surplus or undivided profits. The statement is as follows:

## ASSETS

| | |
|---|---:|
| Loans ..................................... | $58,039.86 |
| Overdrafts ............................... | |
| Banking house ............................ | 9,121.75 |
| Furniture & fixtures ..................... | 2,630.33 |
| Other real estate ........................ | |
| Cash ..................................... | 2.82 |
| Due from F. S. B., Greentop,............. | 2,771.01 |
| Due from Bank of Kirksville, ............. | 552.27 |
| Cash items ............................... | 126.16 |
| Checks on other banks, not entered, ...... | 1,968.05 |
| | $75,212.25 |

## LIABILITIES

| | |
|---|---:|
| Demand deposits, ..,...................... | $37,655.60 |
| Time deposits, ........................... | 15,588.55 |
| Bills payable, ........................... | 34,000.00 |
| Deposit slips not entered, ............... | 4,790.24 |
| State Savings L. & T. Co., Quincy, O. D. ...... | 230.85 |
| Total liabilities .............. .. | 81,765.24 |
| Total assets .................. | 75,212.25 |
| Excess of liabilities over assets ............... | $ 6,552.99 |

But, while this statement shows the bank was insolvent to the extent of $6552.99 at the close of business on August 29, we think it fails to make out even a prima facie case of insolvency for the following reasons. First, it assumes the bank had no more loans than the $58,039.86 in notes found in the vault and up for collateral—in other words, that no notes were destroyed by the fire—whereas for the preceding three years the loans had run $10,000 higher than that. During all that time they had stood a little above or below $68,000. In the official statement of the bank verified by the affidavits of the president and the defendant as cashier, issued as of April 12, 1928. and published the latter part of that month—only about four months before the fire—the loans on personal and collateral security were stated to be $65,827.60, and the loans on real estate security $3,500, a total of $69,327.60. Further, the State wholly failed to show the value of 200 acres of the 520 acres of farm land owned by the bank and we cannot assume this omitted land would not have added substantially to the value of the assets. Neither can we assume that the

bank had no cash except the $2.82 in pennies and nickels remaining in the open safe after the fire. A cash slip was found in the vault calling for $163.48 in coin money and $4002 in paper money, a total of $4165.48 on that day. And while we cannot conclusively accept this figure as correct, especially in view of the fact that it is unusually large as compared with former years—on April 12, 1928, the cash was only $557.82—neither can we say no money was destroyed by the fire.

It was held error in State v. Walser, 318 Mo. 833, 842, 1 S. W. (2d) 147, 151, a case of this character, to refuse an instruction asked by the defendant containing this language:

''It is not enough that the evidence in the case goes to show his guilt, but such evidence must be entirely inconsistent with a reasonable supposition of his innocence. Suspicions, however strong, or probabilities, however great, will not be sufficient to justify a conviction, but the evidence, to justify a conviction must be positive, convincing, establishing the defendant guilty of the charge contained in the indictment beyond a reasonable doubt, and unless the evidence so convinces you, a verdict of not guilty must be returned.''

In our opinion the evidence in the instance case does not furnish any substantial basis for a conviction under the instruction just quoted. There are too many hiatuses in the essential proof. We may surmise the omitted land was worth less than the encumbrances thereon, that the cash had been abstracted from the safe before the fire, and that the amount of loans were just as the examiner reported. But that conclusion must rest on surmise and suspicion.

The State contends the proof warrants a finding that the $58,039.86 in inventoried loans were worth much less than their face. There was evidence that of the $18,893.36 notes in the vault $7602.99 remained uncollected at the time of the trial nearly two years thereafter, and there was testimony that most of these were not collectible. Three of the makers went into bankruptcy more than a year after the bank closed. The deputy commissioner and his attorney made investigations, but the dates of these are not fixed by the testimony. At the time of the trial less than $15,000 had been collected, apparently, on the $31,627 in notes held as collateral by the State Savings Loan & Trust Company of Quincy. But there was practically no evidence directed to the ultimate question as to what the notes were worth in the regular course of banking when the bank failed, or close to then. That was the essential point. [State v. Hill, 329 Mo. 223, 44 S. W. (2d) l. c. 106; State v. McClure, 325 Mo. l. c. 1249, 31 S. W. (2d) l. c. 48; State v. Thompson, 29 S. W. (2d) l. c. 70; State v. Beaghler (Mo.), 18 S. W. (2d) 423, 427.]

There are a few cases that seem not to be wholly in accord with the foregoing view. Thus, in State v. Sanford, 317 Mo. 865, 875, 297 S. W. 73, it appears to be conceded *arguendo* that proof of the

value of a bank's assets in the light of and as affected by subsequent events six or eight months after a deposit was received and the bank failed in January, 1924, may be competent to show the *fact* of insolvency on the last named date, but is not competent as evidence of the defendant's *knowledge* of the insolvency. And State v. Lewis, 323 Mo. l. c. 1086, 20 S. W. (2d) l. c. 536, says the circumstance that a bank was still in course of liquidation two and a half years after it failed in October, 1925, tended to prove it was in an unsafe and illegal condition when it closed. But both these holdings assume external conditions which would affect the value of the bank's assets must have remained substantially the same during the meantime. Considering the rapid decline in the economic situation of this country during the two year period between 1928 and 1930, and the known depressing effect of the failure of a bank on a community dependent thereon, in our opinion it was unfair to the defendant in the instant case to fix the value of the Willmathsville Bank's assets in August, 1928, by showing only subsequent developments and investigations at indeterminate times over the two year period following. In other words, standing alone, as it does for the most part, this evidence was not the kind of proof the law required.

IV. The trial court gave an Instruction No. 3 for the State which told the jury if they found the Bank of Willmathsville failed on August 29, 1928, such failure was prima facie evidence that the bank was insolvent and in failing circumstances when the deposit was received on August 24. The instruction went on to say ''that prima facie evidence is such that raises such a degree of probability in its favor that it *must prevail* unless it be rebutted'' (italics ours). At the request of the State the court gave another instruction, No. 6, in the usual form on the presumption of innocence and at the request of defendant still another instruction, No. 13, saying that while the court had given Instruction No. 3, as aforesaid, ''yet the burden of proving the State's case is not *really* changed'' (italics ours) ; and that the presumption of innocence never shifts but abides with the defendant throughout the trial notwithstanding a prima facie case has been made by the State.

This presents a situation like that in State v. Shelby, 333 Mo. 1036, 64 S. W. (2d) 269, where the earlier cases on the point are ably reviewed by Cooley, C., and many of them overruled. How it can be said the jury was left with any intelligible guide when they were told in one instruction that the State's prima facie case *must prevail*, if not rebutted, and in another instruction that the burden of proof is not *really* changed, is more than we can see. In this case Instruction No. 3 was particularly pernicious because the defendant stood on a demurrer to the State's evidence.

■ V. During the course of the bank liquidation a number of claimants sued and obtained judgments against the bank and the Commissioner of Finance. These were admitted in evidence. The defendant objected and assigns error here contending the judgments were hearsay as to him because he was not made a party to the actions in which they were obtained. This point is not well taken. The judgments were competent on the question of the bank's insolvency, if and insofar as based on claims existing when the deposit was received or when the bank closed. It appears from the record the dates of some of these claims were not shown. To be binding on the bank it was not necessary that the defendant here should have been a party to the actions.

■ VI. The State introduced in evidence as Exhibit No. 18 a letter written by S. M. Cantley, Commissioner of Finance, to H. M. Hewitt, president of the bank, dated December 21, 1926, which was based on the report of an official examination made as at the close of business on December 11, 1926. The letter contained a number of criticisms of the bank, such as the failure to keep a liability ledger, the carrying of certain second mortgage loans and slow loans, a bank loan due from the defendant, overdrafts, the values at which "other real estate" and the banking house were shown on the books, and the amount of bills payable. The letter advised that the bank be retired from business, either by disposing of its assets to another banking institution, or by voluntary liquidation. This suggestion was put on the grounds that the bank lacked sufficient assets to absorb losses and could not operate at a profit.

By Instruction No. 8, given for the State, the jury were told this letter was admitted in evidence "for the sole and only purpose of showing knowledge upon the part of the officers of the Bank of Willmathsville of the condition of said bank on the date covered by the bank examiner's report" (December 11, 1926) "and is of itself no evidence of the insolvency of said bank on the 24th day of August, 1930," meaning August 24, 1928, when the deposit was received. But the instruction then went on to say the letter "should be considered by you only along with other facts and circumstances detailed in evidence in determining the solvency or insolvency of said bank on August 24, 1930." Defendant assigns error to the admission of the letter, contending it was hearsay, and further asserts said Instruction No. 8 was contradictory of itself, misleading, and wrongfully authorized the jury to convict the defendant if they found the bank was insolvent in 1930 two years after the check was deposited.

A similar letter was held incompetent in State v. Peer, supra, 39 S. W. (2d) l. c. 530, and State v. Long (Mo.), 44 S. W. (2d)

67, 68. In those cases the reasons given were that the letter was hearsay, and was not an official report or based on an official report. In the instant case the letter was based on an official report which had not been admitted in evidence though the examiner testified therefrom using it as a memorandum. But there was no proof that in making the examination the officers of the bank were advised of the contents of the report, or that they had been interrogated and answered under oath as the statute permits, Section 5301, Revised Statutes 1929. Neither does this statute require the writing of such letters. It merely says "the result of each examination shall be certified by the examiner upon the records of the" bank, and embodied in a report to the Legislature.

While there is authority holding that a record is not official and public in such sense as makes it competent independent evidence unless the law requires it to be kept, yet the prevailing view is said to be that no statutory direction or authority is necessary "if the record is kept in the discharge of a public duty and is a convenient and appropriate mode of discharging that duty." [22 C. J., p. 802, sec. 914.] In State v. Salmon, supra, 216 Mo. l. c. 530, 115 S. W. l. c. 1126, this court ruled reports of official bank examinations are official records and admissible in evidence as such, but that letters "in no way connected with the reports" and "in which the defendant had no participation" are not. The implication is that if the letters are connected with the reports they should be admitted. On the other hand in Campbell v. Laclede Gas Co., 84 Mo. 352, 369, aff. 119 U. S. 445, 30 L. Ed. 459, 7 Sup. Ct. 278, it was held a letter from the commissioner of the land office at Washington, in which he expressed an opinion about a certified copy of a land patent was improperly admitted. [See also, 22 C. J., p. 808, sec. 919, and Morgan County Bank v. People, 21 Ill. 304.]

Considering the nature of the letter from the Commissioner of Finance in this case, that it was full of admonitions and expressions of opinion, that the recital of facts therein was merely incidental to and a basis for the criticisms, that the letter was addressed to the president of the bank, not to the bank, bank officers or the defendant, and that the latter was not shown ever to have seen it or known of its contents, we think it was hearsay and should have been excluded, certainly if and insofar as it was offered to prove *actual* knowledge on the part of the defendant in this, a criminal case.

The defects and contradictions in Instruction No. 8 are apparent. It says the letter was admitted in evidence solely for the purpose of showing the bank officers' knowledge of the condition of the bank on the date covered by the report, and *not* for the purpose of proving insolvency when the deposit was received nearly two years later in August, 1928; then it says the opposite, telling the jury the letter *is*

to be considered in connection with the other circumstances in evidence in determining whether the bank was insolvent in August, 1928. What purpose the State had in proving the defendant's knowledge of the bank's condition in 1926, unless it was to show he had notice of the bank's tendency toward a failing condition, we do not see. The statement in the instruction of the year of the reception of the check as 1930 instead of 1928 was, we think, obviously a clerical error which could not have misled the jury.

Other errors assigned probably will not occur if the case is tried again. For the reasons given the cause is reversed and remanded.

PER CURIAM:—The foregoing opinion by ELLISON, J., in Division Two is adopted as the opinion of the Court en Banc. All concur.