STATE OF MISSOURI, Respondent, v. FREDIE EDGAR McQUINN, Appellant, No. 41984—235 S. W. (2d) 396.

Division Two, January 8, 1951.

*Ellis Beavers* and *Joe Beavers* for appellant.

*J. E. Taylor,* Attorney General, and *E. L. Redman,* Assistant Attorney General, for respondent.

[396] LEEDY, J.—This is an appeal from a judgment of conviction of murder in the second degree; punishment, a term of 15 years in the penitentiary. The appeal presents the single question of whether the court erred in admitting the written confessions of defendant.

Mary Hammer, the deceased, a spinster, was 82 years of age at the time of her death. She was a recluse, living alone in her dilapidated farm home in an isolated neighborhood of Gentry County, amid surroundings amounting to squalor. She was crippled, being unable to walk without the aid of a crutch and cane. Her dead body, stiffly frozen, was discovered Saturday afternoon, January 22, 1949, in the barn located about a hundred yards north of her home.

In substance, the state's theory of the homicide was that appellant (sometimes hereinafter referred to as defendant) and Harold (Hoover) Emrich, both of whom lived at Stanberry, some 7 miles north of Mary's farm, pursuant to an understanding between themselves to rob Mary, proceeded to her home, and there, sometime between the late afternoon of January 18 and the afternoon of January 22, struck her over the head and upon the body with her own crutch, rendering her unconscious, and while she was in such state, they carried her from the house and placed her in the barn and left her there in frigid, subzero weather, without a crutch, cane "or other means of motivation," and thereby caused and permitted her to freeze to death.

Defendant's complaint is that there was no proof of the corpus delicti independent of the confessions, and that "before these confessions were admissible other evidence in the case must reveal circumstances which not only correspond with the circumstances related

in the confessions, but also such circumstances [**397**] as tended to prove that someone murdered Mary Hammer.'' In murder, the corpus delicti consists of two elements: (1) The death of the person alleged to have been murdered, and (2) the criminal agency of someone other than deceased causing the death. State v. Lyle, 353 Mo. 386, 390, 182 S. W. 2d 530, 532; State v. Payne, 331 Mo. 996, 1003, 56 S. W. 2d 116, 118; State v. Meidle, (Mo.) 202 S. W. 2d 79, 80. It is undoubtedly the rule that confessions of a crime not made in open court or before a committing magistrate and without proof aliunde that a crime has been committed will not sustain a conviction. However, it is equally well established that full proof of the corpus delicti independent of the defendant's extra-judicial confessions is not required. State v. Kauffman, 329 Mo. 813, 46 S. W. 2d 843; State v. Skibiski, 245 Mo. 459, 150 S. W. 1038; State v. McGuire, 327 Mo. 1176, 39 S. W. 2d 523. As said in State v. Thompson, 333 Mo. 1069, 1080, 64 S. W. 2d 277, 282, ''On the contrary, what seemed to be only slight corroborating facts have been held sufficient. State v. McGuire, 327 Mo. 1176, 39 S. W. (2d) 523.''

The Skibiski case, supra (which is a leading case), after declaring that full proof of the corpus delicti independent of the confession is not required, continues thus, l. c. 1039: ''If there is evidence of corroborating circumstances which tend to prove the corpus delicti and correspond with circumstances related in the confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved in a given case. (Citing cases.)'' And in State v. Morro, 313 Mo. 98, 108, 281 S. W. 720, 722, the rule was put this way: ''If there is evidence of corroborating circumstances which tends to prove the crime and corresponds with circumstances related in his confession, both the circumstances and the confession may be considered in determining whether the corpus delicti is sufficiently proved. If a confession is made which enables the state to discover corroborating evidence of the particular crime confessed, the corroborating evidence need not be sufficient, independent of the confession, to establish complete proof that the crime is committed. (Citing cases.)''

Here the fact of Mary's death and the finding of her body are undisputed, so no question arises as to proof of that element of the corpus delicti. We pass then to a consideration of the showing as to the second element, that of the criminal agency of someone in causing such death. This involves an examination of the substance of the confessions and the proof of the circumstances independent of the confessions, which the state insists correspond with the circumstances related in the confessions. The confessions are fairly summarized in the state's brief, as follows:

''Appellant was 34 years of age and lived with his parents, Mr. and Mrs. Clarence McQuinn at Stanberry, Missouri. He had been

keeping company with Elsie Emrich for the past four years and had told Elsie Emrich and had discussed with Hoover Emrich (Elsie's son) the fact that there was quite a lot of money at the Mary Hammer home; he and Hoover had talked about it. They usually did their planning at the B & C Cafe at Stanberry. On the Thursday before January 22nd, appellant and Hoover Emrich walked to Mary Hammer's place to try to get some money; they walked down the Island City Road to the Willie Russel place, sometimes called the Clem O'Neal place, and turned and walked east on the dirt road. They followed the dirt road and then turned south on the dirt road that runs north and south at the Mary Hammer farm. They planned on the way down that Hoover would go to the door first and knock on the door, then when the old lady came to the door they would both force their way in; they knocked on her door; when the old lady came to the door they went in, appellant shoved her down, she said 'don't hurt me.' Hoover asked her where the money was and she said 'in there' pointing with her finger in the bedroom. They found four buckets of money and carried them out in the kitchen; Hoover picked up Mary Hammer's crutch and *hit her over the head and jabbed her two times in the chest.* They then took her to the barn, Hoover carried her head and he carried her feet. They laid her down on the hay on the north side of the manger. While they were placing Mary's body over the manger, *one of her feet slipped out of his hand and her shoe and overshoe came off.* They thought she was dead when they laid her there on the hay. There was some old cow in the barn. Hoover stayed at the barn while appellant went back to the house and got the old lady's crutch and he brought it to the barn where he broke it up by pounding it over the manger. He hit the crutch over the manger two times and threw the pieces over into the hay. They then went back to the house. They took the money and put it in their pockets. It was dark when they started walking back home. Appellant gave his part of the money to Elsie Emrich.

"Elsie Duley Emrich took this money to St. Joe and got it renewed for cash. Elsie asked Hoover there in the kitchen in her place where he got all this money and Hoover wouldn't answer her. She asked appellant whether he and Hoover killed the old lady, and he told her he thought they did, and Elsie said that was too bad. Hoover bought an automobile with some of the money and later bought a '36 Ford. Hoover and appellant went to a station in Albany and bought some tires; they ate two chocolate bars and drank a bottle of pop while there, and when they got the tires on Hoover paid them and gave them old silver dollars. Then they went to Stanberry to the Stanberry Phillips 66 Station and got two more tires on the front.

"A few days before the statement, Elsie and Hoover talked about going to Texas. When they first talked about going to Texas, Elsie said that she would take appellant, but she later decided she didn't want him. Elsie told appellant that if Sheriff Bowman picked him up to be careful and know nothing about it. Appellant told her that he would stay pat and tell them something different. Elsie told him to know nothing about it, so he did, and that is the reason he told them what he did before.

"In his confessions he stated he had been back to the Mary Hammer place afterwards, once with Earl Emrich and they got some money, some of it bills. Then he and Hoover were down to Mary's place and went upstairs and got more money and he was there one more time with Earl Emrich and Raymond Petty, that time to do some moving for Lizzie Hammer. Lizzie went home. They went to King City and then came back and looked for money, but didn't get any. Altogether he was down to Mary Hammer's place 4 times and each time they got money except the last time. He got only $25 out of all the Hammer deal, $20 one time and $5 another."

There was an abundance of corroborating circumstances corresponding to those related in the confessions. The state has set out the same in nine separately numbered paragraphs in its brief, but it will be sufficient to notice only a few of them. For example: Mary's body was found lying where defendant said they laid her (on the north side of the manger in the barn). One foot was without a shoe. Her overshoe, with a tennis shoe inside, was found approximately 3 feet to the west of her feet. Her crutch was found broken in four pieces over in the hay to the north of her body. Her body had an antemortem wound about the size of a quarter over her left eye from a blow of some kind, which left the flesh torn and clotted with blood to a thickness of 1-16ths of an inch. She had two other antemortem wounds on her body about the size of a water glass, one over her heart, and the other one 3 or 4 inches farther down and to the right of the sternum. Mrs. Myrtle Summers, who lived 5 miles south of Stanberry on the gravel road running south from Stanberry toward the Hammer farm (and on the route traversed by defendant and Emrich, as related in the confessions), testified that she met defendant and one of the Emrich boys walking south on the gravel road about 3:30 or 4 o'clock one afternoon in January (before Mary's body [399] was found), as she was coming from Island City. She was uncertain as to the exact date, but she knew she was in Island City on January 18 (from which place she was returning when she saw the men in the road) from the fact that she had a grocery ticket from Island City bearing that date. Jim Brown, who lived on the same road, but a mile to the south of the Summers place, testified that at about chore time, two or three days before Mary's body was found,

636

he saw defendant and another man walking south down the gravel road. Without encumbering this opinion with the details of the other corroborating circumstances, the foregoing are deemed sufficient to have rendered the confessions admissible as against the objections here urged.

The record proper appears to be regular and sufficient. The judgment is affirmed. All concur.