STATE OF MISSOURI, Respondent, v. HAROLD (HOOVER) EMRICH, Appellant, No. 42226—237 S. W. (2d) 169.

Division Two, March 12, 1951.

*Charles A. Miller* and *Clayton W. Allen* for appellant.

*J. E. Taylor,* Attorney General, and *E. L. Redman,* Assistant Attorney General, for respondent.

924

[169] ELLISON, P. J.—The appellant, 20 years old, was convicted by a jury of murder in the second degree in the circuit court of Atchison County, on change of venue from Gentry County, for the killing of one Mary Hammer in January, 1949. The punishment assessed by the jury was imprisonment in the penitentiary for 15 years. The conviction of an accomplice, Fredie Edgar McQuinn, in a prior separate trial in Gentry County with like punishment, was recently affirmed by this court on January 8 [235 SW. (2d) 396].

The deceased Mary Hammer was a recluse 82 years old, who lived alone in squalor mostly in the kitchen of her isolated farm house over six miles southwest of Stanberry, in Gentry County. In the winter she wore her outdoor clothing in the inadequately heated kitchen, and because she was a cripple had her cane and crutch near at hand. Her frozen body was found in a barn about 200 feet from the dwelling house on the afternoon of January 22, 1949, by a neighbor lad, Francis Whitmore, who had gone to talk to her about renting some pasture. She had last been seen alive [except for her assailants, if any] four days earlier on January 18 by another neighbor, Fred Salisbury; and on January 17 by her sister Lizzie, who lived 2-½ miles away. During the intervening time the weather had been cold and snowy, with the temperature ranging as low as 5 to 13 degrees below zero.

The Whitmore lad said when he went to the Hammer place the first time on January [170] 22 the south kitchen door was open and snow was on the floor. Also the south barn door was open. He went to the hen house and barn but could not find Miss Hammer. He no-

ticed one set of tracks in the snow leading from the kitchen porch to a hen house but didn't follow them further. There were no cane or crutch marks therealong. That afternoon he returned with his father and mother and the deceased's sister Lizzie. They made a further search and found Miss Hammer's body near a manger in the barn lying on a ladder and covered with hay. A pitchfork which she sometimes used as a support in slick weather was broken. So was her crutch. An over-shoe, enclosing a shoe from one foot, was off and covered with hay. The cane and mittens she ordinarily used were found in her house.

There were four wounds or bruises on the face and body which the undertaker, Taggart, thought were inflicted before death. One of them on the forehead had been bleeding. The coroner, Dr. Williamson, an osteopathic physician, expressed the opinion that the old lady died of heart trouble. And it was shown she was taking digitalis as a remedy for that disease. Dr. Reutter, a physician, testified an overdose of digitalis would produce dizziness and might cause the person to fall.

The above mentioned accomplice, Fredie Edgar McQuinn, 35 years old, was the State's chief witness. At his own trial he had denied any knowledge of the homicide. But after his conviction and before his case had been heard here on appeal, he testified as a witness for the State in the trial of the present appellant Emrich, and confessed he and appellant Emrich had committed the homicide. He was obviously a person of low mentality; said he could not read or write except to sign his name; and that he could not count money very well. He lived with his parents and helped his father some in the latter's trade as a carpenter. And he often visited the neighboring home of the appellant Emrich and his mother, and knew them well.

Dr. Williamson, the coroner, and Dr. Milligan, both osteopathic physicians, had examined McQuinn. Dr. Williamson thought he was a moron with the mentality of a child about 9 years old. But he agreed that his mental ability as for that age might have increased from experience. Dr. Milligan thought McQuinn had the mentality of a 7 or 8 year old child. But he did a lot of work with his father. He could plow, paint houses, knew something about mechanics, could install electric wiring under direction and could draw good pictures with a pencil. And he gave very lucid testimony about his trip with appellant to Mary Hammer's home on the occasion of the homicide, and what occurred there.

He said he and Emrich went to her farm house door, asked if she had any old iron to sell; gained admission; and made her tell them where her money was in the bedroom. There they found three old syrup buckets full of money, mostly old style large size paper currency in rolls, but also some loose paper money and some gold and silver coins. Appellant struck the old woman three times on the head with

her crutch, and jabbed her in the chest with it twice. They carried the body to the barn, broke the crutch over the manger, and covered both with hay. Thence they hitch-hiked back to Stanberry, and at the street corner where they parted on the way to their respective homes accomplice McQuinn turned over to appellant the money he had got at the Hammer farm.

There was considerable circumstantial evidence tending to corroborate McQuinn's confession. Thus, two residents of Stanberry severally testified that on January 24 they found several pieces of old style paper currency in the street at or near the corner in Stanberry where accomplice McQuinn testified he had turned over his part of the money loot to appellant Emrich, when they parted after the commission of the homicide. And four witnesses who were traveling the highway between Stanberry and the Mary Hammer farm shortly before her body was found, told of seeing appellant and McQuinn walking along that country road in the cold weather.

Likewise Harwood McKain, an employee in a tavern in Council Bluffs, Iowa, testified that late in January and early in February, [171] 1949, the appellant Emrich and a man called Tommy had him exchange some old style large size paper currency for newer smaller bills at the Federal Reserve Bank in Omaha. The bank records showed that $610 in old bills, $180 of them being retired gold certificates, were cashed on or about February 2. On another occasion witness McKain cashed $1500 in old bills for appellant and Tommy retained $500 for his trouble. Appellant was questioned by the Council Bluffs police on January 27, 1949, and denied having any old money. Registration cards of the Ogden Hotel in Council Bluffs were introduced without objection showing he was there on January 27, 28 and 30.

A Mr. and Mrs. Charles Sweat, who operated a gasoline service station in Gentry County testified that on March 19, about two months after Mary Hammer's death, appellant and McQuinn bought two automobile tires from them without inquiry as to the price, and when appellant paid for them he pulled from his pocket a handful of tarnished silver dollars two of which were dated 1881 and one 1900. David Hammer, a nephew, and his three brothers at the direction of the sheriff, searched Mary Hammer's home on or about April 3 after her death and found in some cans about $142. There were seven $20 bills, one an old large size type dated in 1900. And when she paid neighbor Fred Salisbury for some seed corn he said she opened three baking powder cans containing paper currency before she found the money she wanted.

The appellant did not testify before the jury. His main factual defenses were an alibi and that Mary Hammer was not murdered but died of heart disease. On the latter point Dr. Williamson, osteopathic physician and coroner diagnosed the cause of her death as heart dis-

ease, basing that conclusion on the fact that her sister told him she had heart trouble and upon the dark discoloration of the corpse. Two other undertakers and a physician, none of whom had seen the corpse, testified that condition might result from that disease.

As to the alibi, appellant's wife testified he was at home on Saturday, January 22, 1949, the date when Mary Hammer's body was found. She fixed the date by the fact that her sister-in-law gave birth to a child that day. She further testified appellant was at home all that week afflicted with shingles, and did not make any trips, though he could go up town. She identified without objection three registration cards of the Ogden Hotel in Council Bluffs, Iowa as being in appellant's handwriting. These cards showed he and Thomas Beal of Stanberry, Missouri were registered there January 27, 28 and 30, 1949. So much for the facts.

Appellant's motion for new trial contained 40 assignments of error. His brief here contains 38 points. It will be unnecessary to discuss many of these. His first point is that Judge Maughmer of the fifth judicial circuit, who tried the cause, had no legal jurisdiction thereof. He had been called in by Judge Weightman, regular judge of the fourth judicial circuit, in which Atchison County is located, after Judge Weightman had been disqualified to preside by affidavits of prejudice filed by appellant and others as required by Sec. 545.660, R. S. 1949, Sec. 4037, R. S. 1939, Mo. R. S. A.

Having been thus disqualified, Judge Weightman called in Judge Maughmer under and pursuant to Art. V, Sec. 15, Const. Mo. 1945, which provides in part: "Any circuit judge may sit in any other circuit at the request of a judge thereof." Appellant's counsel contend that constitutional provision had no application, at least until the provisions of two applicable statutes had been followed—which was not done in this case. They cite State v. Mitts (Mo. Div. 2) 29 S. W. (2d) 125(3).

Of these two statutes Sec. 545.670, R. S. 1949, Sec. 4038, R. S. 1939, Mo. R. S. A. provides that when a circuit judge had been disqualified to sit in a criminal cause the defendant and the prosecuting attorney may agree to elect an attorney at law to sit as special judge therein. And Sec. 545.690, R. S. 1949, Sec. 4040, R. S. 1939, Mo. R. S. A., provides that if no person so elected as [172] special judge will consent to serve, then the disqualified regular circuit judge may call in another circuit judge to try the case.

We think appellant's counsel err in saying the provision in Art. V, Sec. 15, Const. Mo. 1945, supra, that "any circuit judge may sit in any other circuit at the request of a judge thereof" did not apply. And we hold it was self-enforcing. This question was ruled by this court en banc on facts essentially similar in State v. Scott, 359 Mo. 631, 635 (1), 223 SW.(2d) 453, 455(1). That decision held the provisions of Sec's 545.670 and 545.690, supra, "would seem to be of doubtful

validity under the 1945 Constitution.'' And it further ruled: ''Even if § 4040 [R. S. 1939, Sec. 545.690 R. S. 1949] is still valid, it cannot be thought to override the later constitutional provision just mentioned.'' [Art. V, Sec. 15]. See also State v. Massey, 358 Mo. 1108, 1115(2), 219 SW. (2d) 326, 328 (3, 4). We hold Judge Maughmer had jurisdiction to try the case.

The next and last point which we shall consider at any length is that the trial court erred in overruling his motion to quash the jury panel because the names of the members thereof were drawn from the jury box by the judges of the county court instead of the circuit clerk. Under II Laws Mo. 1947, p. 274 et seq., Sec. 494.230 R. S. 1949, in counties of the class to which Atchison belongs, the circuit clerk, the judges of the county court and the circuit judge compose the board of jury commissioners. Under Sec. 494.240 this board selects the names of not less than 400 prospective jurors proportionately from the townships in the county according to their relative population. These names are written on separate slips of paper of the same size and kind. The slips for each township in turn are placed in a closed box with a sliding lid and thoroughly mixed. Sec. 494.250 designates the *clerk* of the board, that is to say the circuit clerk, as the person to draw out of the box the required number of names for petit jurors and alternates from each township. The statute requires that this be done publicly, in the presence of the board of jury commissioners, and that the clerk in so doing shall take such a position that he cannot see the names on the slips he is drawing.

The undisputed testimony in this case was that the circuit clerk as clerk of the board of jury commissioners did not draw any of the names of the prospective jurors from the closed box; but that all the names were drawn by the three county judges. Neither was it shown that they could not see the names on the slips they were drawing. He said there was no discussion of the persons whose names were drawn, after they were drawn, unless the person was deceased. As to whether the names were publicly drawn, the clerk said he thought the room doors were closed. On cross-examination he would not say the door into the county clerk's office was closed, but stated the door into the outside hall was closed. There was no testimony one way or the other as to the kind of slips of paper on which the different names were written. And the county judges were not called as witnesses.

In our opinion this error in the selection of the jury panel was reversible. The question was discussed at some length and it was so ruled in State v. Rouner, 333 Mo. 1236, 1245(3), 64 SW. (2d) 916, 919(1), 920(2), 92 A. L. R. 1099, 1114(5), note. That decision held that while irregularities in the drawing of a jury panel often may be overlooked, yet the law is stricter when the members of the jury panel were drawn by a party not authorized by law to do so. And the cause was reversed and remanded on that ground. The weight of authority

in the foregoing Annotation supports that view. The Rouner case has very recently been followed by this Division in State v. Paul McGoldrick, 361 Mo. 737, 236 SW. (2d) 306. The only difference between the facts in that case and this, is that there additionally the slips of paper, on which the names of the members of the panel were written, were not uniform in size or kind of paper as required by the statute. But it was not contended this had any effect in enabling the county judges to pick particular jurors.

■ Appellant further assigns error in that appellant's wife was cross-examined on matters not covered in her direct examination, in violation of Sec. 546.260, R. S. 1949. [173] That is true. She was used as a witness to establish appellant's alibi, that he was at home afflicted with shingles during the week in January when the alleged homicide was committed. On cross-examination she was asked whether her husband was at home when her baby was born on March 31 over two months later. That matter had not been gone into in chief. Objection was made on the above statutory ground but the trial court overruled it.

■ Appellant makes a number of assignments of error on the ground that various witnesses were permitted to testify to finding old style paper currency on the streets of Stanberry or at Mary Hammer's home after her decease. It is contended this testimony was irrelevant and immaterial but prejudicial. We think the evidence was competent especially in view of the confession and testimony of appellant's accomplice, McQuinn, that when they assaulted, robbed and murdered the old woman they found and took from her home currency of that character.

We shall not extend the opinion by discussing the many other assignments. For the reasons stated the judgment is reversed and the cause remanded. All concur.