250 S.W.2d 718 (1952)
STATE
v.
EMRICH.
No. 42509.
Supreme Court of Missouri, Division No. 1.
July 14, 1952.
*719 Charles A. Miller, Trenton, Clayton W. Allen, Rock Port, for appellant.
J. E. Taylor, Atty. Gen., E. L. Redman, Asst. Atty. Gen., for respondent.
DALTON, Judge.
Appellant was convicted of robbery in the first degree and was sentenced to a term of seven years in the state penitentiary. Sections 560.120 and 560.135 (all references are to RSMo 1949 and V.A.M.S. unless otherwise specified).
In the first three counts of the information, filed in the circuit court of Gentry county, appellant was charged with murder in the first degree and, in a fourth count with robbery in the first degree, all charges arising out of the same transaction. The cause went on change of venue to Andrew county where, at the close of the state's evidence in chief, the state elected to proceed on the fourth count of the information. The state's evidence tended to show that appellant was an accessory before the fact. See Sec. 556.170.
Mary Hammer, a single person, 82 years of age, lived alone on her 400 acre farm in Gentry county, three miles south of Island *720 City and seven miles south of Stanberry. She was badly crippled by rheumatism and, since about 1941, had walked with difficulty, using a crutch and a cane. During the winter she usually sat in the kitchen of her home, close to the stove, with her overshoes on and her cane and crutch within reach. She paid her bills in cash from a place within reach of her chair, or from containers on the kitchen shelves. She had a few cattle on the farm and she fed them hay from a barn close to the house. She was last seen alive on January 18, 1949, and immediately prior to a six inch snow, which began that day and was followed by several days of sub-zero weather.
On January 22, 1949, the kitchen door of her home was found open and there was snow on the floor several feet back from the door. After a search of the premises her fully clothed body (except for one shoe) was found lying on a ladder close against a manger in the barn. A barn door was open and cattle were going in and out of the barn. The body was partly covered with hay and broken pieces of her crutch were found in the hay near the body. One overshoe with a tennis shoe inside, mates to the shoes she was wearing, was found several feet away. Her hands were bare, but a pair of heavy mittens was found on the kitchen floor underneath the front of the stove. Her cane was close to the righthand side of the chair where she usually sat. Her body was frozen when found, but an examination disclosed two dark bruises about two inches across, one on the left chest over the heart and another three inches to the right, they had been caused before death. A subsequent search of the house was made and a $20 bill was found in a baking powder can and seven $20 bills were found against the east kitchen wall, one of the bills was of large size, old style currency. Some bank and corporation stock certificates and some dividend checks were in the house.
Two murder cases involving much the same facts have previously reached this court. State v. Emrich, 361 Mo. 922, 237 S.W.2d 169; State v. McQuinn, 361 Mo. 631, 235 S.W.2d 396. The testimony of some ten witnesses, as given in the Emrich case, supra, were read in evidence in this case. Fredie Edgar McQuinn, whose conviction of murder in the second degree was affirmed in the last mentioned case, was a witness for the state. His testimony, on the trial of this case, tended to show that he was 36 years of age and that, prior to April 1949, he had lived in Stanberry with his parents for some years. For five years he lived just across the alley from appellant and her children. He visited appellant's home often and kept company with her. McQuinn testified that on a certain afternoon, he was with appellant in Johnny's restaurant in Stanberry and, later he and appellant joined appellant's son Harold (hereinafter referred to as Hoover) at the B. & C. Cafe in Stanberry. It was prior to the death of Charley Clements in an automobile collision north of King City and prior to a trip McQuinn made with Hoover to the Mary Hammer farm. (It was subsequently shown that Clements died on January 22, 1949).
McQuinn and his father were employed by one, Bill McCarty. McQuinn worked in the morning of the day in question, but he was with appellant in the afternoon. While in the B. & C. Cafe, Hoover said to McQuinn and appellant that he knew where there was a lot of old iron down on the Mary Hammer place, if he only had somebody to go with him. Appellant said: "Yes, she has got a lot of black cattle down there, and a lot of money. * * * My mother knowed her ever since she was twelve years old. My father's brother knowed of her and used to work for her at the sawmill out there, and used to make lumber. I know her ever since I was * * I know what you and Fred can do, while you and Fredie are looking around there, looking for iron, you look for that money, if you have to tie her up." It was then agreed that McQuinn and Hoover would go down to the Hammer place and they went there that afternoon.
They left the B. & C. Cafe, walked across the park, down the tracks, went south across the bridge and caught a ride to the Allen corner, where they got out and went south toward Island City on foot. Near the Summer's place they met a car and a car also *721 passed in front of them and went south toward Island City. When they passed the Jim Brown farm, Brown was down at the barn, he waved at them and they waved back. They went on to the Hammer place where McQuinn, who had at one time lived in the immediate vicinity, went to the door, went in, found Mary Hammer and forced her down to the floor. Hoover came in behind him and asked Miss Hammer where she had the money. She pointed into the bedroom, under the bed. At Hoover's direction McQuinn went in and helped him get the money. They got three gallon buckets, shook them up and down and took them back into the kitchen, where Hoover picked up the crutch, hit Miss Hammer three times on the head, jabbed her a couple of times with the crutch, and then the two of them carried her down and placed her in the barn near a manger and put some hay on top of her. Her crutch was then broken over the manger and the pieces thrown on the hay. McQuinn and Hoover then went back to the house and into the kitchen, where they opened the three gallon buckets of money. Both men filled their pockets with money. Some of it was loose and some was tied up with string. Some of it looked like new bills, but some of it was old paper money, some bills were of large size and yellow. There were also some gold coins, pennies and silver dollars. By that time it was getting dark and they left, going east toward the paved highway, where they caught a ride back to Stanberry. On reaching Stanberry, they first visited a pool hall and then headed toward their homes, going along the sidewalk together until they got to the Duffy place, where McQuinn gave all the money he had to Hoover to give to appellant. Two days later McQuinn was over to appellant's home and appellant thanked him for the money. In his presence appellant asked her son Hoover whether they had had to "kill that old woman." Hoover didn't answer, but left the room. Appellant then asked McQuinn and he told her he thought they did. She said, "well, that's too bad." A month later appellant's son had a trial at Albany and, after that, McQuinn was over at appellant's home, when appellant had a suitcase and money on the bed, and she put the money in the suitcase and closed it up. When Hoover asked her how much it amounted to, she said she didn't know, she hadn't had time to count it. She also said that all three of them had better get out of town "the way we paid off up at Albany the law is going to suspicion something and going to come down here and ask where we got this money." She said they had better stay in St. Joseph or go to Corpus Christi, Texas, and cash the old money for something to defend themselves. McQuinn was intending to go with them to Texas, but appellant said he had better not go and she further told him that, if he was picked up, to lay it on anybody. Later, after Hoover had left home, appellant asked McQuinn to go see Columbus McCrary. He did so and then came back and told appellant that Hoover was in St. Joseph but was going to see about a job in Council Bluffs or Omaha. McCrary said he would see appellant the following morning.
Columbus McCrary testified that Hoover wanted to see appellant and that on January 25, 1949, he left Stanberry with Hoover Emrich and Tommy Beal and went to St. Joseph where they saw appellant in the restaurant where she was employed. They had with them some old money from the Mary Hammer house. The following morning police arrested him and took from him a $5 bill of old style currency which was part of the money that Tommy Beal had stuck in his coat pocket the night before. McCrary was released on the 27th and returned to Stanberry. It was on the next evening, Friday night, January 28th, that McQuinn came to his house, asked about Hoover and asked him to see appellant. McCrary saw appellant the next morning at her home in Stanberry and she inquired as to where Tommy Beal and Hoover Emrich had gone. He told her that Hoover had gone to Omaha or Council Bluffs to look for employment. He further testified: "She said to me, she said, `Columbus, I have read in the paper where they picked a boy up in St. Joe over old money.' And she said, "I thought that was Hoover.' I said, `No, that was me.' I said, `I am going over to Albany to tell the law *722 that we have went down to Island City and Tommy and Hoover have went in this house and took some money. She said, `Lord, don't do that; there is a lot more back of this, Columbus, that you don't know about. I think there is murder involved in it. You don't know it, but I know it.' * * * She said, `Columbus, I have a lot of that old money here in the house. I am afraid the law is going to come search the house.' I said, `I can't help that; I am figuring on going to Albany.' She said, `If you do, it is going to be too bad for you. There is murder involved in this, and I am going to drag you in on it.' * * She tried to get me to go with her on the noon bus to St. Joe, and she would borrow a car from someone in St. Joe. I said, `I don't want anything to do with it.' She said, I have money to defend myself. You don't have, so you had better keep your mouth shut.'"
On cross examination by appellant's counsel McCrary admitted he had plead guilty in September 1949 to larceny of money from the Mary Hammer home and had received a two year penitentiary sentence. On further cross examination he said that he, Tommy Beal and Hoover Emrich had gone to the Hammer house in his (McCrary's) car; that he learned it was the Hammer home from the other boys; that Hoover Emrich said an old lady had died and she had money down there; and that they obtained a total of $12,000 and divided it up. The disposition of McCrary's part of this money was fully developed. On redirect examination, it appeared that McCrary, Tommy Beal and Hoover Emrich had been together in the B. & C. Cafe in Stanberry on the 21st of January, but McCrary said they did not tell him they had been down there before, only that they knew an old lady who was dead and that she had money down there.
Other evidence tended to show that before Mary Hammer's body was found, on a day in the latter part of January 1949, as Ben Worth went south from Stanberry about 3:30 to 4:00 p. m., he picked up two men, who were walking south across the bridge, and he took them to Allen's corner. He said the men were McQuinn and Harold (Hoover) Emrich.
Several days before Mary Hammer's body was found, Mrs. Myrtle Summers bought groceries in Island City and as she came north toward her home, about 3:30 to 4:00 p. m., she met McQuinn and Harold (Hoover) Emrich, going south on foot down the road. She thought it was the 18th day of January, 1949, when she purchased the goods at Adam's store. She had bills bearing that date, but she could not be certain she saw the boys on that day.
On January 24, 1949, Arden Swinford was walking in the street in Stanberry, there was quite a bit of snow and, as he passed the intersection between the Duffy corner and the southeast corner of the block where appellant lived, he found a $5 bill of old type, dated in 1882. On the same date, but on the sidewalk near Duffy's apartments, one half block east of appellant's home, Alvin Stuart found two $20 bills, a five and a ten, all folded together, and 20 or 30 feet on east he found another $20 bill on the sidewalk. He cashed them at the Farmers State Bank at Stanberry, delivering them to Mr. Frederick, the banker. One bill was dated June 29, 1910. Ralph Frederick, the banker, a witness for the state, identified two of the bills that had been presented to him by Mr. Stuart.
On March 19, 1949, McQuinn and Harold (Hoover) Emrich came to the Conoco station in Albany and bought two automobile tires. Emrich paid Mrs. Leola Sweat $29 in paper money and reached in his pocket and brought out a handful of silver dollars, three of the dollars were delivered to her. One was dated in 1900 and two in 1881.
Everett Bowman, sheriff, made an investigation at the Hammer barn in April 1949 and found Mary Hammer's tennis shoe and overshoe five or six feet from the manger and he also found the pieces of her crutch. After that appellant called Bowman on the phone from Corpus Christi, Texas, and he learned that her son Hoover was with her there. David Hammer had seen the overshoe, tennis shoe, and the pieces of Miss Hammer's crutch in the barn on January 29, but had left them there. A careful search of the house was not made until April, when seven $20 bills were found, although one $20 bill was found *723 there on January 23, 1949. The house had been closed after Mary Hammer's death.
Appellant's evidence tended to show that she did not know Mary Hammer; that she had never been at or near the Hammer home; that she knew nothing of her son or any one else obtaining any money from Mary Hammer prior to their prosecution; that she was employed in St. Joseph and was not in Stanberry during all of the time in question; and that she never conferred with any one or planned any robbery. Other evidence tended to show that Mary Hammer died of a heart attack; that McQuinn worked with his father each day during the period in question and received payment for full time; that McQuinn was mentally incompetent; that he had made many conflicting statements; that he had testified differently at different times; and that any trip by McQuinn and Hoover to Island City was made after Mary Hammer's death.
In rebuttal the state offered additional evidence to show appellant was in Stanberry during the period and that any employment in St. Joseph did not prevent frequent or daily visits to Stanberry.
Appellant assigns error on the opening statement of counsel for the state, on the admission of evidence, on the court's refusal to strike out the testimony of a witness, on the court's action in striking out the testimony of a witness, on the court's refusal to discharge appellant at the close of all the evidence, on the giving and refusing of instructions, on the argument of counsel, on the failure of the court to discharge the jury on account thereof and on permitting the jury to separate during the trial of the cause.
Appellant's brief contains some five assignments of error directed to the opening statement of the assistant attorney general with reference to facts which the state expected to prove. Some of these assignments are supported by proper assignments in the motion for a new trial and some are not. However, in the trial of the cause, the state did prove most of the facts complained of. Since the admission of these same facts or similar facts in evidence is also complained of and subsequently ruled adversely to appellant, it is only necessary to say that no reversible error appears from the record by reason of the opening statement in question.
Many of appellant's assignments of error with reference to the improper admission of evidence relate to acts, facts and circumstances happening after the alleged robbery and when appellant was not present, to wit, the finding of the money by Arden Swinford near Duffy's corner on January 24, 1949, Alvin Stuart's exhibition to Ralph Frederick of the money found by him at Duffy's corner, Frederick's identification of the money given him by Stuart, Harold (Hoover) Emrich's possession in March 1949 of a handful of silver dollars, some dated in 1881 and 1900, Mrs. Summer seeing McQuinn and Hoover on the road in January, Hoover's presence in a restaurant in Stanberry on January 21, 1949 (testimony of McCrary and Kissinger), McCrary's acts, statements and conduct (evidence developed on cross examination or to which no objection was made) and the sheriff's acts in searching the Hammer house, barn and premises in April 1949, and what was found there. No evidence was offered in support of the opening statement that there would be evidence of Hoover's possession of old money in Omaha. See State v. Emrich, supra, 361 Mo. 922, 237 S.W.2d 169, 171. Appellant contends that she was not bound by the acts of these third parties out of her presence. State v. Newcomb, 220 Mo. 54, 63, 119 S.W. 405, 408. She relies particularly on the case of State v. Hill, 352 Mo. 895, 179 S.W.2d 712, 716, which is the only case cited under seven assignments. Under some assignments, the case of State v. Priesmeyer, 327 Mo. 335, 37 S.W.2d 425, and State v. Buckley, 318 Mo. 17, 298 S.W. 777, 780, are also cited. Reference is made to the rule that "Narrative statements of past events, made after the termination of a conspiracy, are inadmissible against a co-conspirator. Such narratives are rejected as hearsay." The rules relied upon have no application to the evidence here complained of. This evidence was competent as evidence of facts and circumstances *724 corroborative of the facts testified to by witness McQuinn and tending to show the crime charged. State v. Albritton, 328 Mo. 349, 40 S.W.2d 676; State v. Kowertz, 324 Mo. 748, 25 S.W.2d 113, 116; State v. Peterson, Mo.Sup., 130 S.W.2d 505, 506; 77 C.J.S., Robbery, § 46, page 487; 54 C.J. 1063, Sec. 164.
Appellant assigns error on the admission of evidence in rehabilitation of witness McQuinn to the effect that, in the latter part of March or early April 1949, while Gentry County officers were investigating the death of Mary Hammer, McQuinn made a statement in some detail about the assault and robbery of Mary Hammer, which was substantially in accord with his testimony as given in this case. It is contended that the statement of McQuinn as testified to by the witnesses was made to them out of the presence of appellant and after the completion of the crime charged. Appellant relies on the rule stated in State v. Priesmeyer, supra, 327 Mo. 335, 37 S.W.2d 425, 427, to wit, that "the declarations of a co-conspirator, made after the enterprise has been accomplished and merely narrative as to past occurrences, is inadmissible against co-conspirators." The rule has no application here since the evidence was admissible on other grounds. In this case McQuinn had been impeached on cross examination as to prior conflicting statements and testimony. Documentary evidence executed by him was offered and received as a part of the cross examination. The testimony now objected to was admitted solely for the purpose of rehabilitation. The state was properly permitted to show that, prior to the admitted conflicting statements and testimony and prior to the execution of the documentary evidence, McQuinn had told the witnesses a story about the transaction consistent with the testimony given in the trial of this cause. State v. Ransom, 340 Mo. 165, 100 S.W.2d 294, 297; State v. Richardson, 349 Mo. 1103, 163 S.W.2d 956, 960; State v. Fleming, 354 Mo. 31, 188 S.W.2d 12, 15.
Appellant contends that "the court erred at the close of the State's case in not striking the testimony of Fredie McQuinn" for the reason that all the evidence showed that McQuinn was "wholly incompetent to testify or to understand the purport and meaning of an oath" and that his testimony was inadmissible for any purpose. No issue as to the competency of McQuinn to testify was raised when he was called as a witness, nor until long after his examination and cross examination had been concluded. When the motion to strike was presented and ruled there was testimony in the record tending to show that McQuinn had attended school some ten years and had reached the third or fourth grade; that he could not read or write, except to write his name; that he frequently suffered with headaches and didn't feel like working; that he knew nothing about figures or directions; that he had the mentality of an idiot or moron; that he had the mentality of a child of four, five, six, seven or eight years of age; and that he was imaginative and easily led. The evidence concerning McQuinn's mentality was offered by appellant long after the cross examination of the witness had been concluded. There was also testimony tending to show that when McQuinn was first arrested he said that Thomas McCrary and Tommy Beal killed Miss Hammer; and that he later said that he and Hoover Emrich assaulted and robbed Miss Hammer. In his own trial, on the murder charge, supra, he testified that he didn't kill Miss Hammer or have anything to do with it. His affidavit and application for his appeal in his own case was offered in evidence in connection with his cross examination. Appellant further contends that McQuinn's testimony in this case conflicts in numerous respects with that of his testimony at other times and with the testimony of his father, his employer and numerous other witnesses, who testified either for the state or for appellant.
Appellant was no doubt fully advised concerning most of these matters when McQuinn was permitted to testify without objection. Some of the evidence now referred to was identical with that offered in the case of State v. Emrich, supra, in which appellant's counsel appeared. The assignment must be overruled. The motion to strike was not timely made. State v. Peebles, 337 Mo. 973, 87 S.W.2d 167, 169; 23 C.J.S., Criminal Law, §§ 1070, 1071, page *725 500. Further, the competency of the witness was waived. State v. Whitsett, 232 Mo. 511, 526, 134 S.W. 555; State v. Crab, 121 Mo. 554, 563, 26 S.W. 548; State v. Parker, 301 Mo. 294, 256 S.W. 1040; 70 C.J. 184, Secs. 251, 253.
Appellant contends that the court erred in striking out the testimony of witness Byron Bertram because it supported appellant's theory that Mary Hammer died a natural death or froze to death and it tended to impeach McQuinn's testimony. Bertram was a licensed mortician. A part of his testimony in State v. Emrich, supra, was read and then stricken out on the ground that it didn't show when Mary Hammer died. In her motion for a new trial appellant contended that the testimony showed death by heart attack and that defendant could not have been guilty of robbery. The evidence did not tend to show death prior to the alleged robbery. The court did not err in striking the testimony.
Appellant contends that the court erred in refusing to direct a verdict for appellant, as requested, at the close of all the evidence for the reason that there was no substantial evidence connecting appellant with the commission of any crime and because the testimony of McQuinn was impeached by his own statements and by the evidence of other witnesses. Appellant cites State v. Huff, 161 Mo. 459, 61 S.W. 900, 1104; State v. Newcomb, 220 Mo. 54, 119 S.W. 405, 409; State v. Gregory, 339 Mo. 133, 96 S.W.2d 47, 52; State v. Craft, 338 Mo. 831, 92 S.W.2d 626. The cases do not support the contention that appellant should have been discharged under the facts of this case. The rule is that this court will not weigh the evidence in a criminal case if the verdict and judgment below is supported by substantial evidence, that is, by evidence legally sufficient to induce a belief of defendant's guilt beyond a reasonable doubt in the minds of jurors of average reason and intelligence. State v. Gregory, supra, 339 Mo. 133, 96 S.W.2d 47, 51. After conviction, all substantial testimony implicating the accused must be taken as true, and every reasonable inference indulged and then, if substantial testimony supports the verdict, it must stand. State v. Smith, 329 Mo. 272, 44 S.W.2d 45, 49.
Notwithstanding the fact that McQuinn was a co-conspirator and an accomplice in the crime of robbery, his testimony was legally sufficient, if believed by the jury, to establish the conspiracy and the fact of the robbery committed pursuant thereto. His testimony was in fact corroborated in numerous respects, but it was not necessary in order to make a submissible case and sustain a conviction in this case that his testimony should have been so corroborated. A conviction may be sustained upon the uncorroborated testimony of an accomplice in the crime charged. State v. Stogsdill, 324 Mo. 105, 23 S.W.2d 22, 27; State v. Craft, 299 Mo. 332, 253 S.W. 224, 228; State v. Pierson, 343 Mo. 841, 123 S.W.2d 149, 156. We hold that a submissible case was made out. State v. Craft, 338 Mo. 831, 92 S.W.2d 626, 629(1).
Appellants complain of the refusal of Instructions C and D and of the giving of Instructions 1, 4, 5, 6, 7, 7A, 7B, 8 and 11. The court did not err in refusing Instructions C and D. The matters sought to be covered were quite as favorably covered by other instructions. We have carefully considered all of the objections raised by appellant to Instructions 1, 4, 5, 6, 7, 7A, 7B, 8 and 11, and have reached the conclusion that these are not erroneous under the facts of this case and that the court did not err in giving any of them.
Appellant contends that the court erred in allowing the jury to separate, even by agreement under Sec. 546.230, because robbery in the first degree is a capital offense. While the fourth count of the information charged robbery in the first degree under Sec. 560.120 it did not charge "robbery in the first degree by means of a dangerous and deadly weapon" and the death penalty provided by Sec. 560.135 did not apply. The case submitted was not a capital one. Ex parte Vickers, 201 Mo. 643, 645, 100 S.W. 585. The assignment is overruled.
Appellant contends the court erred in permitting the assistant attorney general to comment upon and dispute and impeach *726 the testimony of Jim Brown, a state's witness. There is no suggestion that the assistant attorney general did not act in good faith in calling the witness. See State v. McQuinn, supra, 361 Mo. 631, 235 S.W.2d 396, 399. After some preliminary questions, Brown testified that he saw McQuinn and another fellow going south about 3:30 or 4:00 o'clock "three days after Charlie Clements' wreck" and after Mary Hammer's body had been found. In replying to statements of appellant's counsel with reference to matters outside and to argument and comments, the assistant attorney general said of the witness "He has backfired on me in this lawsuit. I admit it." However, no objection was made on the ground that this statement was a comment on the testimony of the witness or that the argument tended to dispute and impeach the state's witness. The objection was to his apology for the witness. The statement was retaliatory and did not constitute reversible error.
It will not be necessary to review other assignments of error, all have been carefully examined and no reversible error appears.
The judgment is affirmed.
All concur.