**STATE of Missouri, Respondent,**

v.

**Allen GANTT, Appellant.**

**No. WD 32969.**

Missouri Court of Appeals, Western District.

Dec. 21, 1982.

Mari W. Privette, Liberty, for appellant.

John Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before SOMERVILLE, C.J., and TURNAGE and CLARK, JJ.

SOMERVILLE, Chief Judge.

A jury found defendant guilty of raping an eight year old female (Section 566.030.3, RSMo Supp.1982), a class B felony, and assessed the maximum punishment, i.e., fifteen years confinement in the Missouri Department of Corrections (Section 558.011, RSMo Supp.1982). After an unavailing motion for new trial, judgment was rendered and sentence pronounced accordingly.

Seldom has this court encountered a record on appeal so replete with unpreserved error that appellate review, if had, must fall almost entirely under the aegis of Rule 29.12(b), the "plain error" rule. This observation is vouched for by the fact that appellate review of eight out of nine points raised by defendant are dependent upon applicability vel non of Rule 29.12(b).

Nothing short of "pathetic" and "bizarre" can describe this case as reflected by the record on appeal. A general overview of the case, with emphasis upon certain unorthodox events, best puts it in proper perspective. Throughout, it should be borne in mind that the victim was an eight year old female child who was "slow in her development" and functioned at "the chronological age of three and a half to four and a half years old." The victim's father described her as retarded. At the time in question the victim was enrolled in a special education class for mentally retarded students. Defendant was a black male, eighteen years of age, and the uncle of the victim. According to a psychiatric report defendant was a person of "below average" intelligence who appeared to be functioning in the "dull normal range of intelligence, lower limits of the average ranges and intellectual ability" and was "immature, indecisive, insecure, and passively manipulative."

Prior to trial defendant filed a motion in limine to have the victim declared an incompetent witness on the grounds that she was under ten years of age and mentally retarded. Although a hearing was held on defendant's motion in limine prior to trial, a ruling thereon by the trial court was deferred without explanation.

■ Section 491.060, RSMo 1978, insofar as here pertinent, reads as follows: "The following persons shall be incompetent to testify: ... (2) a child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which he is examined, or of relating them truly; ...." It is the duty of the trial judge to determine the competency of a witness, and in a case to be tried to a jury, such determination is to be made upon a voir dire examination of the witness outside the presence of the jury. *State v. Singh*, 586 S.W.2d 410, 415 (Mo.App.1979); *J.L.W. v. D.C.W.*, 519 S.W.2d 724, 730 (Mo.App.1975); and *Pollard v. Decker*, 354 S.W.2d 308, 314 (Mo.App. 1962).

When the trial commenced, the state called the victim as its first witness. Defense counsel immediately objected on the ground that the victim was not a competent witness. The objection was overruled. In the presence of the jury, the victim was questioned at length by the assistant prosecutor in an effort to establish her competency as a witness. Counsel for defendant did not object to the state's voir dire examination of the victim in the presence of the jury. Even a cursory examination of the record reveals that the voir dire examination of the victim in the presence of the jury succeeded only in projecting the image of a pathetic, subnormal child who was incapable of conveying her impression of any relevant, substantive facts, lacked ability to orally express herself, did not understand or comprehend the meaning of an oath, and who could not differentiate between truth and falsity. This image, highly prejudicial from defendant's standpoint, was compounded and indelibly imprinted upon the minds of the jurors by the fact that the assistant prosecutor three times asked the same general array of qualifying questions with the same adverse result each time.

After the state's third effort to establish the victim's competency as a witness, the trial court stated, "I might suggest that maybe you call your next witness." The aforementioned is the only thing that even approaches a ruling on the victim's competency as a witness. Although the state studiously avoided questioning the victim as to any substantive matters, the inexorable impact before the jury was that of a pathetic, subnormal child who was patently incompetent by statutory measure to testify as a witness regarding violation of her person.

Undaunted, the assistant prosecutor pursued an aberrant course to counteract the state's failure to qualify the victim as a competent witness. Immediately after the victim left the witness stand the state called as witnesses, in succession, two of the victim's special education teachers, a regular teacher who was privy to certain conversations had by the former with the victim, and a guidance counselor. Their testimony, hereinafter collectively summarized, is replete with hearsay, although not a single objection was lodged against it on that basis by defense counsel. On December 9 or 10, 1980—the alleged rape having been charged as occurring on December 8, 1980— the victim, while at school, complained that she "couldn't sit down" because "it hurt her" to do so. Her complaint precipitated an examination of her vaginal area which was described as "red and irritated". In response to pedagogical questioning, the victim pointed to her vaginal area and said "she had been stuck by a needle". The following day the victim again complained at school that it "hurt her to sit down". She was taken to the school nurse who diagnosed her trouble as "some type of vaginal infection". With a teacher "prompting" her and upon further questioning by the school nurse, the victim stated that "she got breed in the hole" by the "ghost". Upon further pedagogical questioning the victim stated that she was afraid of the "ghost" and, pointing to her vaginal area, that the "ghost" put "his needle down there and hurt". The guidance counselor, who felt the teachers were not

"really pushing for answers" to their questions, took the victim into her office and, while the two were alone, "pulled [the victim] ... real close and ... said, 'It's okay, honey, just tell me what happened'." In response, the victim "kept shaking her head". The guidance counselor then prompted the victim by the use of certain carefully couched questions and elicited the following from the victim: "Get stuck with the needle down in the hole"; repeated references were made to "the ghost"; the "needle was black"; "that she had to put the needle in her mouth"; "[t]he needle goes into her hole and she pointed in the front area and the back area"; "Breed, you know, everybody get breed. Momma get breed. Get breed to have baby"; and "Ghost breed me."

Although none of the four state witnesses mentioned above ever testified or intimated that the victim identified defendant as the "ghost", a police detective who investigated the offense testified on behalf of the state, without objection, that some time after January 3, 1981, the victim, when questioned by him, identified defendant as the "ghost".

■ The principal vice of hearsay evidence is that it deprives an accused of his Sixth Amendment right of confrontation and concomitant right of cross-examination, fundamental constitutional rights made obligatory on the states by the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 403–04, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

■ The state leans upon the res gestae rule to legitimatize the hearsay testimony heretofore related. Its attempt to do so fails to wash under the facts and applicable law. Spontaneity produced by the event itself is the essential test of whether a hearsay statement is admissible under the res gestae rule. *State v. Hook,* 432 S.W.2d 349, 353 (Mo.1968); *State v. Scott,* 535 S.W.2d 281, 283 (Mo.App.1976); and *State v. Lewis,* 526 S.W.2d 49, 54 (Mo.App.1975). The length of the temporal lag between the event itself and utterance of the hearsay

statement, although not controlling by any means, is a factor to be considered in determining the spontaneity of the hearsay statement. *State v. Pollard,* 174 Mo. 607, 74 S.W. 969, 971 (1903); and *State v. Scott, supra,* 535 S.W.2d at 283. Moreover, hearsay statements elicited by questioning or interrogation reflect a lack of spontaneity which is a viable consideration in determining whether such hearsay falls within the res gestae exception (the hearsay rule). *State v. Hook, supra,* 432 S.W.2d at 353–54; *State v. Pollard, supra,* 74 S.W. at 971; and *State v. Hendricks,* 172 Mo. 654, 73 S.W. 194, 201 (1903). The hearsay statements in the instant case were a narrative account of a prior event, elicited by repeated questioning, and in no way constituted spontaneous utterances produced by the event itself. Perforce, the rampant hearsay cannot be justified under the guise of res gestae.

Prior to trial, defendant filed a motion to suppress an oral inculpatory statement made to a law enforcement polygraph expert, and a written confession subsequently obtained by police officers investigating the offense. Defendant sought to have both suppressed on the ground that they were involuntary. Following a pretrial hearing, defendant's motion to suppress was overruled in the face of polarized testimony from the parties on the issue of voluntariness. During the trial, the state, after laying a foundation, offered into evidence the written confession obtained from defendant and the same was admitted over defendant's objection that it was involuntary. The polygraph expert, without objection, testified on behalf of the state that defendant orally admitted to him that he committed the offense.

 Due to admission of the confessions mentioned above, the prejudicial impact of the previously mentioned hearsay must be assessed in more than a strict evidentiary context. It, as well as the voir dire examination of the victim in the presence of the jury, must be assessed in the broader context of their effect upon defendant's credibility as a witness since he took the stand, categorically denied he committed the offense, and testified at length that the confessions were involuntary. No quarrel lies per se with admission of the confessions because where, as here, there is conflicting evidence on the issue of voluntariness their admissibility rests in the discretion of the trial court. *State v. Jensen,* 621 S.W.2d 263, 264 (Mo.1981); *State v. Royal,* 610 S.W.2d 946, 949 (Mo. banc 1981); and *State v. Flowers,* 592 S.W.2d 167, 170 (Mo. banc 1979). Where the voluntariness of a confession is the sole issue raised, the law in this state contemplates a hearing outside the presence of the jury and an initial determination by the trial court as to whether it was voluntary; if the trial court finds that it was voluntary, the confession is admissible in evidence before the jury subject to receipt of evidence upon the issue of whether or not it was involuntarily given; and it is the ultimate prerogative of the jury to assess its probative value and reject it if found to have been involuntarily given. *State v. Mitchell,* 611 S.W.2d 211, 214 (Mo. banc 1981); and *State v. Washington,* 399 S.W.2d 109, 114 (Mo.1966).

Defendant does not attack either the oral inculpatory statement or the written confession for lack of a *Miranda* warning. The sole thrust of his attack is that neither was voluntarily given and, moreover, that the written confession, in the format of various printed warnings and typed questions and answers, did not accurately reflect what he told the interrogating officer. Suffice it to say at this moment, defendant's testimony was antithetical to that offered by the state.

With respect to the oral inculpatory statement testified to by the polygraph expert, defendant implies that it was evoked by physical intimidation. With respect to the written confession, defendant testified that the interrogation was conducted at the Excelsior Springs police headquarters. Although the interrogation was principally conducted by one officer, another officer was intermittently in and out of the room where the interrogation was conducted. According to defendant, he was immediately asked whether he raped the victim, to

which he replied, "No, I didn't". The officer conducting the interrogation then told defendant that he had raped the victim, and they had "pictures and witnesses" and "enough evidence on ... [defendant] in ... [their] office to take ... [defendant] to the Supreme Court." When asked if he was hungry, defendant said he was and the officer brought him some food. Defendant testified he was repeatedly asked if he raped the victim, and each time in response thereto he answered "No". Although defendant eventually signed the statement, he testified that he did not do so of his own free will and that he was "upset" and "afraid". Defendant further testified that the officer did not read to him that portion of the printed matter that he could have an attorney present. According to defendant, the interrogating officer accused him of lying during the interrogation and used "bad language" when addressing him. Defendant also testified that he asked the interrogating officer if he could go home. In response, the interrogating officer purportedly told defendant "unless you tell me that you did it we're going to be here all day." Defendant claimed he finally said, "I did it", and signed the statement in order to go home. Defendant further testified that he was unaware of the actual contents of the written confession until after the trial commenced at which time he realized it didn't reflect the "no" answers he repeatedly gave the interrogating officer. According to the testimony of the interrogating officer, defendant was "upset and crying" during the course of the interrogation.

 The voluntariness of the confessions must be viewed against certain obtaining principles of law. Whether a confession is voluntary turns on an evaluation of all the circumstances under which it is given. *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975); and *State v. Flowers, supra,* 592 S.W.2d at 169. Although the giving of a *Miranda* warning is to be considered in determining whether a confession is voluntary, it is not an exclusive consideration. *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. at 2261. Physical condition, age, ex-

perience, and intelligence of a declarant, as well as attendant surroundings, are germane considerations for determining the ultimate issue of whether a confession attributed to an accused is the product of a free will. *Mincey v. Arizona,* 437 U.S. 385, 398–401, 98 S.Ct. 2408, 2416–18, 57 L.Ed.2d 290 (1978); *Brown v. Illinois, supra,* 422 U.S. at 603, 95 S.Ct. 2261; *State v. Flowers, supra,* 592 S.W.2d at 168–69; and *State v. Barnett,* 338 S.W.2d 853, 856 (Mo.1960). Against this backdrop of legal principles, there is no escape from the conclusion that resolution of whether the confessions in the instant case were voluntary or involuntary reposed in the jury. It is axiomatic that the jury's resolution thereof necessarily entailed an assessment of defendant's credibility as a witness.

A salient question posed by the record in this case is whether the unbridled hearsay evidence as to details of the charged offense and identification of defendant as the perpetrator, coupled with the pathetic image of the victim portrayed to the jury by reason of the voir dire examination of the victim conducted in its presence, was all the jury considered, or deemed necessary to consider, in finding defendant guilty of the charged offense. If the voluntariness of defendant's confession had not been put in issue before the jury, it could arguably be said that the hearsay evidence and voir dire examination of the victim in the presence of the jury constituted harmless error by reason of defendant's inculpatory statements. But this is not the situation presented by the record in this case. Whether the confessions were the product of defendant's own free will was a viable issue for the jury to resolve and doing so pivoted upon the jury's assessment of defendant's credibility as a witness. Pragmatically viewed, the pernicious hearsay, conjoined with the unprecedented voir dire examination of the victim in the presence of the jury, permitted the jury to disregard consideration of defendant's confessions as a vital link in establishing defendant's guilt, or, if considered, permitted the jury to treat the hearsay and voir dire examination as effec-

tively destroying defendant's credibility as a witness.

▮ The apical question in this case is whether the unpreserved errors permeating this case rise to the level of "plain error". Admittedly, not every error of constitutional proportion commands relief under the auspices of "plain error". *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967); and *State v. Howard*, 540 S.W.2d 86, 87 (Mo. banc 1976). As laid down in *State v. Howard, supra*, at 87, appellate courts must "... 'review all the facts and circumstances in each case and determine on a case-to-case basis whether manifest injustice has resulted from the alleged error.'" *Chapman v. California, supra*, 386 U.S. at 24, 87 S.Ct. at 828, holds that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." No such belief can be declared in this case. Whether the unpreserved error transcended prejudicial error and resulted in "manifest injustice" or a "miscarriage of justice" under Rule 29.-12(b) remains to be determined.

▮ This court is constrained to hold that the rampant hearsay constituting error of constitutional dimension, in conjunction with the prejudicial impact of voir diring the victim in the presence of the jury, resulted in "manifest injustice" or a "miscarriage of justice" and therefore cognizable on appeal under Rule 29.12(b), the "plain error" rule. This result is foreordained by reason of the fact that this court finds no escape from the conclusion that the pervasive errors heretofore mentioned either precluded, in the minds of the jurors, the necessity of considering the defendant's evidence, or, was seized upon by them as totally devastating defendant's credibility as a witness. A reading of the record on appeal in this case, page by page, mocks even the most fundamental concept of a fair trial. The dispositional result reached by this court does not rest on any utopian belief that nothing short of a letter perfect trial satisfies the ends of justice. It does, however, rest upon a firm belief that the image

of justice is inextricably cut by what is done in cases such as this, and that the image of justice is defaced when unpreserved error of the magnitude present in this case is cryptically excused as not resulting in "manifest injustice" or a "miscarriage of justice."

▮ Retrial of this case necessitates addressing one other point raised by defendant—proof of the corpus delicti independent of defendant's confessions. Defendant argues that if the profuse hearsay is excluded no evidence existed independent of defendant's confessions to establish the corpus delicti. The corpus delicti is established by proof of the crime charged and that it was committed by someone. *State v. Wood*, 596 S.W.2d 394, 401–02 (Mo. banc 1980); and *State v. Summers*, 362 S.W.2d 537, 542 (Mo.1962). To establish the corpus delicti the proof need not point the finger of guilt to any particular individual. *State v. Garrett*, 595 S.W.2d 422, 430 (Mo.App. 1980). As urged by defendant, an extrajudicial confession, without independent proof of the corpus delicti, will not sustain a conviction. *State v. Craig*, 328 Mo. 938, 43 S.W.2d 413, 414 (1931); and *State v. Hunt*, 570 S.W.2d 777, 778 (Mo.App.1978). It is also well established, however, "that full proof of the corpus delicti independent of defendant's confession is not required". *State v. O'Neal*, 436 S.W.2d 241, 245 (Mo. 1968). See also: *State v. McQuinn*, 361 Mo. 631, 235 S.W.2d 396, 397 (Mo.1951); *State v. Skibiski*, 245 Mo. 459, 150 S.W. 1038, 1039 (1912); and *State v. Colton*, 529 S.W.2d 919, 922 (Mo.App.1975). Elaborating thereon, if evidence by the state of corroborating circumstances tending to prove the corpus delicti corresponds with circumstances related in an extrajudicial confession, both the circumstances and the confession may be considered in determining whether the corpus delicti was sufficiently proven. *State v. Skibiski, supra*, 150 S.W. at 1039; *State v. McQuinn, supra*, 235 S.W.2d at 397; *State v. O'Neal, supra*, 436 S.W.2d 245; and *State v. Colton, supra*, 529 S.W.2d at 922. A look at the record in this case vis-a-vis the foregoing legal principles reveals that the vic-

tim was examined by a doctor on December 11, 1980. The examining doctor testified that the victim was eight years old and that her hymen was "not intact", that he observed "inflamation" and "bruising" around the victim's vaginal area, and that in his opinion, based upon his examination and "reasonable medical certainty", the victim sustained "sexual abuse and or sexual trauma" which was neither "self inflicted" nor caused by "accidental means". Defendant's claim of lack of evidence independent of his extrajudicial confessions to establish the corpus delicti is rejected.

Judgment reversed and cause remanded for a new trial.

All concur.